[Crim. No. 20943. July 1, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL DAVID HOGAN, Defendant and Appellant.

[Crim. No. 21582. July 1, 1982.]

In re CARL DAVID HOGAN on Habeas Corpus.

818

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Mark E. Cutler, Chief Assistant State Public Defender, and Tom Lundy, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold Overoye, Assistant Attorney General, Edmund D. McMurray, Ward A. Campbell, Jana L. Tuton, Michael J. Weinberger and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death. (See Pen. Code, § 1239, subd. (b).)[1] A habeas corpus petition alleging newly discovered exculpatory evidence was also filed in this court.

### I.

Carl David Hogan was convicted by a jury of the first degree murder of Theresa Holland and the first degree murder of Jeremy Montoya, Theresa Holland's four-year-old son. (§§ 187, 189.) As a special circumstance it was alleged that appellant was personally present during the commission of the two murders, that he intended to cause the deaths and that he thereby committed more than one offense of murder. (Former § 190.2, subd. (c)(5).) This allegation was found to be true. Also, appellant was convicted of an assault with intent to commit murder upon Theresa Holland's infant son, Adam Holland. (Former § 217.) The jury fixed the penalty at death.

These offenses occurred during the afternoon of May 16, 1978, in the Hollands' home in Bakersfield. The victims were stabbed and bludgeoned with hammers and possibly other instruments.

The case against appellant rested on his presence at the scene of the homicides and other circumstantial evidence.

Appellant was discovered in the Holland residence by Dennis Holland, Theresa's husband, when Dennis returned home from work on May 16. Holland testified that as he entered the house, appellant tried to strike him with a sledge hammer. Testimony from the coroner indicated that the sledge hammer, which was covered in blood that matched

---

[1]All statutory references hereinafter are to the Penal Code, unless otherwise indicated.

the blood types of Theresa Holland and Jeremy Montoya, could have caused the wounds on the victims. When Holland yelled for neighbors to call the police and bring a gun, appellant went out the back of the house. Dennis reentered the home and found his wife and stepson dead and his infant son injured.

Appellant surrendered to the police several blocks from the Holland residence. He had blood stains on his trousers and boots. He also had a steak knife and a camera that were taken from the Holland residence, along with two $20 bills.

At trial, appellant maintained that he was innocent of the charges against him, that he had discovered the victims shortly before Dennis Holland returned home, and that he was overcome at the scene and was totally confused by it. Appellant testified that the bloodstains on his pants and shoes were acquired as he knelt near the victims. Although he admitted he had grabbed the sledge hammer when he heard sounds at the front door, appellant denied swinging the hammer at Dennis.

Expert psychological testimony was introduced which indicated that the killings were inconsistent with appellant's personality. Further, this testimony also supported his claim of psychological immobilization after his discovery of the victims. Several witnesses testified concerning appellant's whereabouts on the afternoon in question to corroborate his account of his activities on the day of the killings.[2]

---

[2]Appellant, during the pendency of his appeal, filed a petition for writ of habeas corpus based on newly discovered evidence. A declaration of a coworker of Dennis Holland was the evidentiary basis for the petition. According to this coworker, Dennis had made statements that prior to his marriage, he had been institutionalized after severely beating a woman with whom he was living. According to this coworker, Dennis had confessed on several occasions to a fear that he would blackout and kill his family. Dennis allegedly revealed that at times he would have to leave the house after arguments with Theresa, particularly when Theresa would bring up the fact that Dennis was not the father of her son Jeremy. Dennis allegedly told the coworker that he became so upset during these arguments he felt like hitting Theresa. The coworker also alleged that it was easy to leave work at the machine shop for an hour or so without being detected, and that Dennis and the coworker had punched each other's time cards on occasion so that they could leave work early. The coworker did not come forward with this information until after appellant had been tried and sentenced to death.

In the return to the order to show cause issued by this court, a counterdeclaration by Dennis Holland was included. He denied ever physically injuring any woman and indicated that a five-month stay at Camarillo State Hospital was a voluntary one to overcome drug abuse problems. He further denied ever blacking out when angry or telling anyone he was worried about blacking out and killing his family.

In view of the reversal of judgment on other grounds, the petition for writ of habeas corpus is denied as moot. Appellant may seek admission of the newly discovered evidence at the retrial of this case.

Appellant and Dennis Holland worked at Hopper's Machine Works in Bakersfield. They met when appellant, who had recently moved from Oklahoma and needed transportation to work, learned that Holland was interested in selling his motorcycle. Accompanied by his wife and her uncle, appellant went to the Holland home on the evening of May 6, 1978, and purchased the motorcycle for $550. Appellant gave Holland $300 in cash and agreed to pay the $250 balance in two equal installments when he received his paychecks on May 19th and June 5th. A bill of sale was prepared by Holland and each of them retained a copy.

Appellant knew very little about motorcycles, so Holland took appellant for a demonstration ride and instructed him in the type of motor oil to use. The name of the correct brand of oil was written on the bill of sale. During the course of the evening, Carolyn Hogan (appellant's wife) and Theresa Holland discovered that they attended the same church. Tentative plans were made for the Hogans to come to dinner.

Sometime between May 6th and May 15th, appellant stopped by the Hollands' house to obtain the can of motor oil that Dennis had told him to use. Dennis Holland was not at home, but appellant spoke to his wife for about 20 minutes. Theresa Holland told Dennis about appellant's visit and Dennis later saw appellant at work and told him which brand of oil to use.

Theresa wanted to use the proceeds from the sale of the motorcycle to finance adoption proceedings so that Dennis could adopt her son, Jeremy Montoya. Dennis wanted to use the money to buy a freezer for his truck in the hopes of establishing an ice cream business to supplement his income. The two argued, and according to Dennis' trial testimony, she pushed him and he shoved her back. Theresa then remarked, "Why don't you hit me?" and Dennis struck her on the shoulder. Finally, Dennis said, "Go ahead and do it if it means that much to you."

However, on May 15th, the day before the homicides, Dennis told appellant that a deposit had been made on the freezer. Dennis asked appellant for the money he owed him so that the freezer could be picked up on Friday. Appellant assured Dennis that payment would be no problem.

On May 16, appellant left work at 10:30 a.m. because he had a 1:30 p.m. medical appointment. According to appellant, he had been exper-

iencing troubles with his motorcycle and had had difficulty starting it that morning. On his way out, he saw Dennis Holland and they had a brief conversation. Holland noticed that the motorcycle was running roughly and told appellant he was using the wrong kind of oil. Appellant rode home, showered, and left about noon, wearing a light blue shirt and blue pants.

Two neighbors saw appellant walking toward the Hollands' house between 12 and 1 p.m. They testified that appellant looked dazed, numb, and was limping slightly. Other neighbors saw Jeremy Montoya and two young girls playing in front of the Holland house some time between 2 and 2:30. Another neighbor noticed at 3:30 that the Hollands' drapes were drawn, which was unusual when the Hollands were at home. The drapes had been open at 1:30.

Yet another neighbor spoke to her three-year-old son who had gone over to play with Jeremy at 3. In response to his mother's question, the child indicated that he had gone in the house and Theresa Holland had told him that Jeremy was asleep. At 3:15 or 3:20, that neighbor's other son, age 12, saw another man—not appellant—standing in front of the Holland house, several feet from the front door, with a "slurpy" in his hand.

Dennis Holland testified that he left work at 3:30 p.m., drove a co-worker home, stopped briefly by the freezer store and an optometrist's office, and arrived home at approximately 4:10. He opened the front door, stepped inside, and out of the corner of his eye noticed appellant swinging the hammer toward him. He jumped back and the hammer missed him by inches. Holland testified that appellant tried to strike him with the hammer. Holland asked, "Why did you swing that thing at me?" Appellant responded, "What are you doing?" Holland said, "You must be crazy," to which appellant replied, "You must be crazy. I'm just doing some work in your house. Something in the back."

According to Holland, appellant, hammer still in hand, began to walk toward the kitchen near the back door as he talked. Holland stepped inside the house, but backed outside again when appellant started walking toward him. Holland called out to his wife and family, and appellant told him that everything was all right, that they were "asleep."

Holland testified he told appellant to put down the hammer, and then called to his neighbors to contact the police and to bring a gun. Two lit-

tle girls who were being cared for by Theresa came out of Jeremy's room, where they normally napped. Holland called the girls to him and put them outside.

The two men struggled in the front doorway, with Holland briefly trapping appellant between the door and the screen. Holland went into the yard to arm himself with a skateboard so he could enter the house. Neighbor Ben Woods, who had heard Holland's cries for help, approached carrying a handgun. He tucked it into his waistband as he was halfway across the street. When Holland went back into the house, appellant was gone and the back door was wide open.

Appellant was seen climbing over a redwood fence, walking through several gates, stopping to pet a barking dog on the head, and walking down a nearby street. A police car approached, and appellant walked toward it. Without direction from the police, he put his hands on top of the vehicle. When the officers patted him down they found a small Instamatic camera in his right front pocket, a steak knife in his right rear pocket, some sunglasses, and his wallet, which contained two twice-folded $20 bills. The officers noted that appellant was perspiring heavily and that the front of his shirt was quite wet. They also observed that his shirt had been misbuttoned.

In the meantime, Holland, followed by his neighbor Woods, entered the house. Holland testified that they went to the master bedroom where he found his wife lying with her head in a pool of blood, her feet tied loosely with a black cord, and knotted pieces of a sheet around her throat. Holland then saw the infant Adam lying next to her, still breathing. He took Adam outside, handed him to a neighbor, and asked for an ambulance. He returned to Adam's bedroom and opened the door. He testified he found Jeremy on the floor, with a blanket covering him up to the chest, and his hands tied with rags. Two head wounds were visible, and Holland heard Jeremy's last breaths.

Sheriff's officers arrived within moments. They found pools of blood near Theresa Holland's body and blood on the waterbed in the master bedroom. A number of bloody rags were found near the body, and there were blood spots on the walls, dresser, closet doors, and trunk in that room. Some of the spots were over five feet above the floor.

The police also discovered blood on a highchair tray in the kitchen and on the door knob between the kitchen and the service porch. A bent

and bloodied serrated butcher knife was found on the kitchen counter, and a later search turned up a claw hammer with blood on it in the garage. Police also recovered the small sledge hammer which Holland had earlier seen appellant holding. There was blood on the head and handle of the sledge hammer. The steak knife recovered from appellant matched other knives in the Hollands' kitchen, but contained no evidence of blood on it.

A wet bathroom towel, which had no visible bloodstains on it, was found in a trashcan in the bathroom. There were bloodstains on the formica area of the bathroom sink and on a tube of toothpaste and a bar of soap on the sink top.

The autopsy of Theresa Holland revealed numerous skull fractures and head lacerations from at least three blows to the head. Deep wavy parallel lacerations, approximately two inches long and an inch apart, were found on the back of the skull with linear skull fractures underneath. These wounds were not caused by the claw hammer, sledge hammer or serrated butcher knife, in the opinion of the coroner.

The coroner testified that these wounds were caused by point blank trauma with a blunt instrument such as a crowbar, a carpet-laying tool, or possibly from a fall against open dresser drawers. The nose had a small laceration and it was fractured. There were cheekbone injuries which could have been caused by a grazing blow from a hammer or a direct blow from a smaller object.

Several knife wounds were also evident. One wound was on the right side of the neck, approximately one and a half inches long and two inches deep. Another stab wound was on the left side of the back, through the ribcage and into the lung, about four or five inches deep. Both wounds could have been inflicted by a serrated butcher knife. There were cuts on three of the finger pads on the left hand and the front of the right hand between the thumb and forefinger. These cuts were consistent with an attempt to ward off a knife attack. The lower back portion of both hands showed a slight redness.

The traumatic wounds were the cause of death and they were probably inflicted at about the same time. Death occurred some time between several minutes to an hour after the injuries were inflicted.

The autopsy of Jeremy Montoya also revealed blunt force injuries and stab wounds. The back of his head bore multiple lacerations on the left side. There were multiple fractures over the entire skull. The wounds appeared to have been caused either by a blow by a heavy instrument without much force or by a smaller instrument wielded with great force. Either the sledge or the claw hammer found at the scene could have caused the wounds, though the claw hammer was more likely. A deep laceration above the right eyebrow was indicative of a forceful sweeping motion with a knife. Another laceration was present over the bridge of the nose. All wounds appeared to have been inflicted at the same time. Death was caused by massive cerebral hemorrhage due to blunt force injuries.

The infant, Adam Holland, survived after portions of his skull were surgically removed. Despite the lack of any lacerations to the scalp, there were fractures to both sides of the skull. These injuries could have been caused either by the child having been struck with an instrument or having been dropped.

In an examination of appellant after his arrest, police found no blood in his hair (head or chest), but found considerable blood stains and spots on his trousers and boots. Bloodstains were found on the cuffs and on the inside seams of both pant legs up to the knee. A criminalist testified that the stains on the pants were not consistent with mere contact with a pool of blood, but were caused by drops hitting the pants. As for the blood stains on the boots, the criminalist testified that one large, heavy stain which soaked into the top of the boot and seeped into the cracks between the sole and the upper portion of the boot was, in his opinion, not consistent with a person stepping into a pool of blood.

A drop of blood was found on the back side of a lens of the sunglasses seized from appellant when he was arrested. Traces of blood were also detected between the lenses and frame of the sunglasses. In the criminalist's opinion, the drop could not have been caused by wiping action. A bloodstain was also found on the back of appellant's shirt collar. Although no other blood spots were visible on the shirt, a litmus filter paper test gave a positive reaction for blood on the right front side of his shirt. A gray shirt which had been found in the master bedroom had numerous small bloodstains on it, in the form of both spots and mist-like deposits.

The officers who arrested appellant observed a cut on appellant's finger and an abrasion to his elbow but noted that they were not bleeding.

The prosecution introduced at trial a series of statements which appellant made after his arrest. The police tape recorded most of three interviews they had conducted with appellant. Two of these interviews were on the evening of May 16. The third took place the following evening. Without the knowledge of appellant or his wife, police also recorded three conversations he had with his wife at the jail—one at 11:18 on the evening of May 16, another at 6:54 on the following evening, and a third on the morning of May 18. The police also recorded a telephone conversation appellant had with his wife at 9:10 on the evening of May 17, with the knowledge of both appellant and his wife.

Until the third interview with the police on the night of May 17, appellant maintained his innocence of the crimes, both to the police and to his wife. However, during the third interview with the police, and during two subsequent conversations with his wife, appellant made various admissions of guilt which he repudiated at trial.

In the first interview, which was conducted on the night of May 16, appellant denied any part in the killings and gave an account of his whereabouts from the time he left work that morning until the time he was discovered in the Holland home. In a second interview later that evening, appellant again described his recollections of the day's events and denied having harmed the victims or having been involved in an affair with Theresa Holland.

Shortly after this second interview, appellant was allowed to talk with his wife Carolyn. The police surreptitiously recorded their conversation. Appellant explained the events of the afternoon to his wife and repeatedly denied hurting anybody.

Appellant spoke to his wife again the following evening, and the police again surreptitiously recorded the conversation. Appellant continued to deny his guilt, but began to express doubts about his sanity, due to the fact that "everybody says I'm crazy."

Less than an hour after this conversation, the police conducted a third questioning. The police officers again reminded appellant of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and then focused on the $42

that appellant had at the time of his arrest. The officers told appellant that according to Theresa Holland's husband, she had two $20 bills in her wallet on the morning of the 16th, but that police found her wallet empty after the killings. The police accused appellant of lying about where he obtained the two $20 bills. Appellant again denied stealing the money. When asked to think about what he saw when he discovered the bodies and to describe the first thing he did, appellant began to cry and said, "I hit the little baby, I don't know, I don't know, I don't know." He repeatedly said "I hit her ... I don't know ... I just hit her ..." When asked what Theresa had done to make him mad, appellant said, "Nothing."

In response to a series of questions, appellant said he did not know why, but he had hit her. He said he did not remember how he hit her. After being asked twice if he had used the hammer he had in his hand when Dennis came home, appellant said he thought so. When asked why he had tied her up, appellant said he did not think he had. Throughout this questioning, appellant was sobbing.

In response to questions about where he had obtained the extension cord used to tie up Theresa and the knife used to stab the victims, appellant said that he found them both on the floor. Once appellant interjected, "Oh. I killed them. Oh my God. Oh God." and then "I don't kill, I don't kill people ...." Appellant denied having or attempting sexual relations with Theresa. He denied that money was the motivation, saying that the Hollands were poor too. At the end of the questioning, when asked what had caused it all, appellant said, "I want Carolyn to have everything. I can't give her nothing." Appellant was emotionally wrought and weeping during the questioning and eventually became so upset that he vomited. The officers finally acknowledged that appellant could not regain his composure and ended the questioning.

Ten minutes later, appellant was allowed to telephone his wife. Both he and his wife were advised that the conversation was being recorded. Before Carolyn Hogan spoke to her husband, the police told her that he had admitted responsibility for the murders and was very upset. Appellant's first remark to his wife was, "I don't know what, I'm a murderer. I can't get over I'm a murderer." His wife asked if he was sure he did it or was just so confused he didn't know, and appellant replied that he thought he did it. He said he thought he remembered hitting the baby but did not recall stabbing Theresa Holland. He was unable to offer

any reason why he had done it and said, "I'm a murderer. I can't believe it. I don't kill people."

Appellant spoke to his wife again when she visited him in jail on the morning of the next day, May 18. He didn't know why he had committed the killings and was unable to supply any details or explanations. When asked if he was sure he had done it, he said, "I don't know." At one point he said to his wife, "[Y]ou keep asking me and I keep telling you I don't know. You're just like 'em."

At trial, the prosecution argued that the motive for the murders was robbery and pointed to the two $20 bills and the Instamatic camera which the police found in appellant's pockets as evidence in support of this theory.

Dennis Holland testified that on May 15, he had given his wife $50 to hold for him. The following day he took a $10 bill from his wife's wallet, saw that there were two $20 bills in it, and placed the wallet in a diaper bag. Holland had told the police on May 17 that there was $60 in his wife's wallet and that he had removed $20. A defense investigator stated that Holland had told him he removed a $5 bill. The police had informed Holland on May 17 that appellant was carrying two $20 bills when he was arrested.

A number of law enforcement officers testified regarding the whereabouts of Theresa Holland's wallet. While several different versions were given by sheriff's deputies and investigators regarding exactly when, where and by whom Theresa Holland's wallet was discovered, all agreed that the wallet was discovered in the house after the house had been sealed by the police and that the wallet had no money in it when found.

At trial, appellant asserted his innocence, although he did not try to establish who had actually killed Theresa Holland and her son. He called witnesses from a restaurant, auto parts store and 7-Eleven store to testify about his whereabouts and movements on the day of the murders. Appellant also took the stand.

Appellant testified that as he was driving to the medical center from his home, his motorcycle began to spew smoke and vibrate. It then

stopped running.[3] After several unsuccessful attempts to start it, appellant left the motorcycle outside a nearby restaurant[4] and walked to the Holland house, which was one-third of a mile away, about a seven-minute walk. Appellant explained that he didn't know anyone in the area and wanted to tell Theresa that he was at the restaurant so she could send her husband to help him start the motorcycle when he returned from work.

Appellant testified that he telephoned from the Holland residence and cancelled his medical appointment. He played with Jeremy and visited with Theresa Holland for approximately an hour. Appellant mentioned that his wife had been asking him to get a camera to take pictures of their daughter—a topic Theresa and Carolyn had earlier discussed—and Theresa Holland loaned him her camera, which appellant took with him when he returned to his motorcycle. Before appellant left, he asked Theresa to have Dennis come to where the motorcycle was parked.

Appellant stated that he returned to his motorcycle but still could not start it. He walked to a nearby auto parts store, hoping to remedy the problem with a new spark plug. He was unable to determine the specific spark plug he needed. The sales clerk at the store remembered him being there between 2 and 2:30.

Appellant testified that he then had a cup of coffee at the restaurant near where he had left his motorcycle. A cook at the restaurant saw a man who resembled appellant sitting at a booth with a cup of coffee between 2:30 and 3, nervously looking out the window of the restaurant before leaving at around 3 p.m. Appellant testified that he then went back to his motorcycle, waiting for Dennis for some time.

Appellant stated that he walked to a 7-Eleven store which was several blocks from the Holland residence and purchased some cigarettes. A clerk from the 7-Eleven store recalled that she was counting the money in her cash drawer at the end of her 8 a.m. to 4 p.m. work shift when

---

[3]Appellant's wife testified that the motorcycle had stalled repeatedly when she had ridden with her husband a few days before the homicides. Her uncle and aunt testified that when they had borrowed the motorcycle on May 13, it had stopped running several times and finally had to be pushed back home.

[4]The motorcycle was found at the restaurant later that afternoon by police. No evidence was offered by defense or prosecution to establish whether the motorcycle showed signs of malfunction.

appellant entered and purchased cigarettes. The clerk also testified that she saw appellant in a police patrol car as she left work about 10 or 20 minutes after the cigarette purchase. The clerk had noted nothing unusual about appellant during the cigarette purchase. She did not notice bloodstains on his clothes nor was he nervous or upset.

Appellant's account of the next few minutes was as follows. He walked from the 7-Eleven store to the Hollands' residence. He knocked on the partially opened door, called for Theresa, and thought he heard someone say "come in." He entered and saw the little girls for whom Theresa was caring. He asked the girls where Theresa was. They just looked at him and resumed their playing. He continued down the hall, calling for Theresa. Behind a partially opened door he saw the bloodied figures of Theresa and Adam. Appellant testified that he did not recognize Theresa Holland at first, and thought that his own wife and daughter lay before him. He felt confused and sick, and was not sure how long he remained in the room, although it felt like a long time. He kept thinking about his father whipping him with a belt and could actually feel the whipping. He thought as well about how he let his parents down when he couldn't play football any more. He said he never fully realized the woman was Theresa Holland, although he did eventually realize that it was not his wife Carolyn.

A clinical psychologist who examined appellant several times and was present when appellant was administered sodium amytal, testified by way of explanation that appellant had related the terrible scene before him to his own guilt about a recent incident in which he had slapped his daughter's hand.[5] This then triggered a flashback to beatings suffered by appellant as a child. The psychologist gave the opinion that the trauma occasioned by appellant's discovery immobilized him psychologically.

Appellant testified that while he was in the bedroom, he recalled kneeling near Theresa, bumping his shins against her as he felt her cheek for warmth. He recalled dropping his sunglasses and wiping them off on his leg. He heard from outside the house someone say, "Get over the fence."

---

[5]Appellant's wife Carolyn, her aunt and her niece all testified that sometime in the ten days preceding the homicides, appellant had slapped his one-year-old daughter Heather's hand when Carolyn had told him to keep Heather out of the house plants. These three witnesses testified that after the slapping, tears came to appellant's eyes and he was very upset.

Appellant stated that he went to the room where the girls were playing and told them not to come out because something bad had happened. He said he heard a rattling at the living room door and, thinking the killer had returned, picked up a sledge hammer he found on the floor and stood by the door with the hammer raised above his head. When Dennis Holland came through the door, appellant testified that he lowered the hammer and did not attempt to strike him with it. Appellant recalled that he said, "Oh God, Dennis, you scared me," and that Holland replied, "You scared me too, Carl." Appellant also stated that he started to tell Dennis that he wanted Dennis to work on the motorcycle, but Dennis interrupted him. Appellant indicated that when Holland pressed him for an explanation of why his family did not answer his calls, he said, "Theresa's asleep now, don't you understand, she's dead."

Appellant testified that he saw a neighbor approaching with a gun in response to Dennis' shouts for help. Appellant became fearful of being shot, walked out the back door, picking up an Instamatic camera from the floor and a kitchen knife from a table as he left. He took the knife to defend himself but was unable to explain when cross-examined why he took the camera. The prosecution also elicited from appellant the fact that he had not, in his prior statements to the police about the camera, ever claimed that Theresa had loaned it to him.

Appellant also denied taking $40 from Theresa's wallet. Appellant stated that when he cashed his paycheck he bought the motorcycle and put most of the remaining cash in his wife's purse as was his custom. He said that he kept a $20 bill and some change from this amount and that he later took another $20 bill from the purse. This gave him $40 which he planned to use for a Mother's Day and anniversary present for his wife. He recounted that he put the money in a shirt in his locker at work and that for several days he kept forgetting to retrieve the money and take it home. The weekend before the killings, Carolyn Hogan, who had noticed that the money left from her husband's first paycheck was fast disappearing from her purse, said she needed some money. Appellant told her he had $40 at work with which he had planned to buy her a present. The following Monday, May 15, Carolyn and her aunt planned to buy a dress with the money. Carolyn was irritated when appellant forgot to bring the money home from work. The next day, May 16, appellant remembered to put the money in his pocket to bring home. Carolyn Hogan, her aunt, and her cousin testified that on the night before the homicide, appellant had told his wife that he had left

money at work but was going to buy her a dress for Mother's Day with the money.

At trial, appellant acknowledged that on May 17, he had told the police that he thought he hit Theresa. He said that when he made the admission he believed it to be true, although he did not remember it happening and could not conceive of a reason why he would have done it. After being told by police that the girls and other people outside had seen him do it, he believed that he must have done it. He thought that maybe he had gone crazy and needed help. The following Sunday he changed his mind, however, because he remembered finding Theresa and Adam Holland already on the floor and didn't remember seeing Jeremy at all.

The prosecution used the details of appellant's first two exculpatory statements to impeach his trial testimony. For example, it was elicited that appellant had in those statements never mentioned going into either the restaurant or the 7-Eleven store, or waiting by his motorcycle after leaving the auto parts store. In these first statements to the police, appellant said that he returned to the Holland residence at about 3 p.m. At trial, it was the defense theory that appellant did not return until after 4 p.m. and did not have sufficient time to commit the killings before Dennis Holland's arrival.

Also, appellant, in his statements to police, indicated he did not touch Theresa. At trial, he testified that he bumped up against her with his shins and touched her cheek, causing her to move. The prosecution argued that such changes in testimony were made to explain the bloodstains on appellant's pants.

The defense introduced the testimony of two expert psychiatric witnesses. Dr. Phillip Kelly, a psychiatrist, had conducted a sodium amytal interview with appellant. The trial court refused to admit a videotape of the two-and-one-half-hour interview as evidence that appellant was not repressing memories of the killings. However, Kelly was allowed to testify to his opinion, based on the sodium amytal interview, that appellant was not repressing. Kelly explained that a subject under the influence of sodium amytal could intentionally lie but that if a good hypnotic trance were induced by the drug, involuntarily repressed memories would surface. He said that appellant had entered into a hypnotic trance quite readily and concluded that he was a very suggestible person. While in

the trance, appellant said nothing about having harmed Theresa Holland or her son.

A clinical psychologist, Dr. Roger Wright, also testified regarding his conclusions after extensive examination and interviewing of appellant. Wright testified about appellant's thought processes when he discovered the bodies in the Hollands' house. He concluded that appellant felt considerable guilt about his failures as a husband and a father, and found that appellant was one of the most readily suggestible people he had ever encountered professionally. After hearing the evidence related above, the jury convicted appellant as charged and found the special circumstance allegation to be true.

The penalty phase followed. Appellant was the only witness called to the stand. He testified that at the time of the offenses, he was 24 years old. Appellant had no prior criminal record, and had never been arrested except for an AWOL incident in the Navy when he was 17 or 18. Appellant had been married for eight years and had one infant child. Appellant had worked at several jobs in Oklahoma before coming to California. He had worked fairly continuously since he first obtained employment, having been unemployed as an adult for a total of about one month.

Appellant testified that he did not use drugs or alcohol and had been involved in church membership and ministry work from 1971 to 1977 with the Assembly of God Church. The prosecution presented no evidence at the penalty phase. The jury returned a verdict of death.

## II.

### VOLUNTARINESS

Appellant challenges the admission of his third statement to the police and his subsequent statements to his wife. Appellant contends that his May 17th statement to the police was involuntarily made. He argues that it was the product of promises of help by the police. Appellant also contends that false police statements regarding conclusive proof of his guilt, coupled with suggestions that he had committed the crimes while mentally ill, amounted to psychologically coercive brainwashing. Appellant contends that the other statements made to his wife the same night and the following morning were tainted by the illegality of the initial statements.

This court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Randall* (1970) 1 Cal.3d 948, 959 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74].) With respect to the conflicting testimony, the court must "accept that version of events which is most favorable to the People, to the extent that it is supported by the record." (*People* v. *Randall, supra*, 1 Cal.3d at p. 954.) The burden of proof which must be sustained by the prosecution on questions of voluntariness is proof beyond a reasonable doubt. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].)

The police questioning of appellant, which consisted of two sessions on the night of May 16th and a further session on the night of May 17th, was conducted by two police officers, Officers Orman and Clendenon. The officers began the first interrogation at approximately 6 p.m. on May 16, about an hour and 40 minutes after appellant's arrest. Although most of the questioning was tape recorded, Officer Orman testified that before each of the three interviews, there was conversation between the officers and appellant which was not recorded. Orman stated that there were about 10 minutes of conversation before the first interview. Orman admitted saying to appellant in this unrecorded portion of the interview that "if there was a mental problem involved in this situation that I would like to know what it was and we would see what we could do to help him." Orman stated that the unrecorded portion was preceded by *Miranda* warnings and an agreement by appellant to speak with the officers. The taped portion of the first interview commenced with *Miranda* warnings and appellant's stated understanding of the rights and agreement to talk to the police.

The taped portion of the first interview spanned 47 minutes, terminating about 7 p.m. It consisted of appellant's explanation of his whereabouts on that day and his exculpatory statements concerning how he came to discover the victims in the Holland house.

A second interview commenced at the jail about 9:30 p.m. The substance of the unrecorded initial portion of this interview was the subject of some dispute between the two police participants, Orman and Clen-

denon. Orman testified that Clendenon told appellant that the two girls in the house had observed appellant commit the homicide and that he (Clendenon) thought appellant had committed the crime. Clendenon testified that all he said was that the girls had seen appellant hitting Jeremy, but he acknowledged that at an earlier hearing he had denied saying anything to appellant about what the girls had seen. In substantial agreement with Officer Orman's version of events, appellant testified that Clendenon had told him that the two girls had seen him do it.[6]

The taped portion of the second interview discloses that appellant continued to maintain his innocence while being questioned. This second interview concluded after 30 minutes of questioning.

Later that night, appellant was permitted to see his wife and this conversation was secretly recorded. Again, appellant denied having committed any crimes. He insisted that he "wouldn't hurt no little baby." Appellant recounted portions of his interrogation to his wife, saying that the police had said "'Why don't you just tell us that you did it then we'll get help for you' like I'm nuts and I'm not nuts." He also said to his wife that "[T]hey acted like if I pleaded like I'm nuts they'd get me off." Near the end of the conversation, appellant said, "The little girls said that they saw me but I know they didn't. He was just trying to make me think that I was crazy. But I didn't do anything. They said they saw me and I hit 'em, see and I know they didn't. Cause I didn't, so how could they."

Appellant remained in custody the next day, and was permitted to speak to his wife again the following evening at 6:54 p.m. The police again surreptitiously recorded the conversation. Appellant continued to deny his guilt, but began to express uncertainties about whether he committed the homicides and about whether he was crazy. Appellant

---

[6]Substantial evidence is lacking to support Clendenon's testimony that he did not make the statement in question. Clendenon's version that he had told appellant only that he had been seen by the two girls hitting Jeremy was at odds with his previous denial of mentioning anything to appellant about what the girls had seen. The two other participants in the conversation, Officer Orman and appellant, both recalled that Officer Clendenon made the statement in question.

Also, the trial court appeared to credit Officer Orman's testimony over that of Officer Clendenon. In response to defense counsel's argument at the voluntariness hearing that Officer Clendenon's testimony should be disregarded because "according to him nothing happened," while Officer Orman was trying to remember details, the trial judge responded: "I have no problem with that."

repeatedly mentioned the prior police statement about eyewitnesses who had seen him commit the homicides and suggestions that appellant needed mental help.[7]

During this conversation appellant's wife also told him that the police "said that they proved that you raped her." She also told him "I had it in my mind that when I came in here that you were gonna tell me the truth, that you did it and that you raped her." Near the end of the conversation, appellant was told "everything points to you doing it and you don't seem like you can come up with anything that says you didn't do it. If there was just anything to stand on, one thing." One of appellant's last comments to his wife was "You gotta be crazy to kill somebody." Appellant's voice was highly emotional during this conversation, breaking frequently and at times lapsing into sobs.

---

[7]The following exchanges are illustrative:
"Hogan: Carolyn, I'm not crazy, am I?
"Wife: Carl, I don't know. I don't know, you don't know.
"Hogan: But I'm not—I'm not crazy now.
"Wife: I know, Carl, but you don't know what somebody's gonna do in a split second. I'm not saying your're crazy. I don't think you are....
"..........
"Wife: Carl, I'm not saying you're crazy and I don't think you are crazy but I do know people go off the deep end just—all of a sudden and you're not above it and neither am I ....
"..........
"Wife: Well, the officer I talked to last night, Thurston, Sergeant Thurston, he told me that he thought you went berserk and done it.
"Hogan: I had no reason to go berserk....
"Wife: Yeah. Uh, if they put you in another cell with somebody else, you better watch what you're doing because Uncle Harold said they'll kill you.
"Hogan: Maybe I deserve it too.
"Wife: If you didn't do it, you don't, Carl. And even if you went berserk you still don't deserve it because you're sick.
"Hogan: Yes, I do.
"Wife: Don't start talking that-a-way. You say you didn't do it.
"Hogan: If I do I don't know.
"Wife: Why?
"Hogan: Because everybody says I'm crazy. I don't know ....
"..........
"Hogan: ... but even the detectives said that the kids saw me hit them.
"Wife: Well, they won't take those kids' word for it though—three years old, they were just two and three—their ages.
"Hogan: Yeah, but they were talking.
"Wife: Who was talking?
"Hogan: The kids were talking. I want them to take their word cause I think those detectives are lying. I think those little girls could help me out. I might be wrong but—but I don't know. I just don't know. I couldn't stand myself to know that I did it in craziness because I still did it. That's what I'm afraid of. And if you did it, you did it, don't matter if you're crazy or not."

Less than an hour after this conversation, the police questioned appellant for the third time. There was again a portion of the interview that was not tape recorded by the police. Officer Orman indicated that he again brought up the question of whether appellant had a mental problem. He told appellant that "if there is a particular problem why this thing could have been committed let me know and if it's a mental problem, whatever it might be, maybe we can help you with this part of the treatment or you know what might happen."

The taped portion of this third interview began with a reading of the *Miranda* rights, and appellant was asked if he understood each right. Appellant indicated that he understood the rights and wished to talk to the police. The officers began questioning appellant about where he had obtained the two $20 bills found in his wallet. Appellant said that he had been saving the money for an anniversary and Mother's Day present for his wife. The police then confronted appellant with the information that two $20 bills were missing from Theresa Holland's wallet, and that appellant's wife had told police that she did not know that appellant had $40 on him that day. The police accused appellant of lying about the money, then asked appellant to focus on when he went into the bedroom and saw Theresa and the baby. At this point, appellant began sobbing and made the incriminating statements described earlier.

██ It is against this factual background that this court must independently determine whether the prosecution has sustained its burden of proving beyond a reasonable doubt that appellant's statements were voluntary.

"The cases in this court are clear from the earliest time that any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law." (*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].) ██ The comments made to appellant by the police prior to the first and third interrogations clearly implied an advantage to the appellant if he talked since it was indicated that, if he cooperated, the police would help him. The use of phrases such as "we would see what we could do to help [you]" and "maybe we can help you with *this part of the treatment* or you know *what might happen*" (italics added) carry the clear implication that appellant could expect more lenient treatment if he

were to confess than if he persisted in his denials. The language used in this case is quite similar to that held improper in the case of *People* v. *Gonzales* (1902) 136 Cal. 666, 668 [69 P. 487], where the sheriff said he "would do whatever he could" for the defendant, if the defendant repudiated his denial and admitted guilt.[8]

In the instant case, the impact of these statements is made clear by appellant's comments to his wife which were recorded without his knowledge. In that conversation, he said the officers told him "'Why don't you just tell us that you did it then we'll get help for you.'" While mere exhortations by the police to a suspect to tell the truth are not improper, this court has repeatedly drawn the line between such exhortations and express or implied promises of leniency. "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper .... On the other hand, if ... the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].)

The prosecution seeks to uphold the admissibility of the statements, despite the offers of police help. First, it is contended that because appellant did not admit to being mentally ill in his incriminatory statement to the police, he was not affected by the inducement. This argument fails to take into account the condition of appellant while making the statement. Appellant was sobbing uncontrollably throughout his statement and vomited. The police were forced to terminate the interrogation due to appellant's inability to control himself or answer coherently. Any failure by appellant under these circumstances to verbalize that he had a mental problem does not reasonably support the suggested inference that appellant was free of the influence of the police offer of help when he made the statement.[9] This factor is clearly

---

[8]As this court held in *Gonzales*, "It scarcely needs reasoning to show that a statement extorted as was this one is not the free, voluntary statement which the law contemplates shall alone be admissible .... That inducements and promises were thus held out sufficient to destroy the voluntary nature of the statement admits of no doubt, and the statement, amounting to an admission or confession of guilt, was therefore clearly inadmissible." (136 Cal. at p. 668.)

[9]It is claimed that appellant's statement was admissible because the police did not promise that appellant would escape the death penalty or prison. However, *Hill* states

insufficient to carry the prosecution's burden of demonstrating voluntariness in the face of the prior police offers of help.

The prosecution also contends that the inducements were not the "primary motivating factor" behind appellant's statements. Reference is made to certain portions of appellant's testimony at the voluntariness hearing, in which appellant stated that at the time he confessed he had been convinced by the police that he had committed the homicides. According to respondent, this testimony supports a finding that appellant's testimony was not induced by any promise of benefit.

However, this argument is both factually and legally flawed. While appellant did indicate that the police had convinced him that he had blacked out and committed the homicides, such indications were linked in appellant's testimony to the offer of mental treatment or help. In effect, appellant's testimony was that by telling him falsely that he had been observed committing the homicides, the police convinced him that he had unknowingly committed the homicides and thus needed the mental help they were offering.[10] Thus, the prosecution cannot fairly claim that appellant's testimony indicated that the promises of help were not "a motivating cause." (*People v. Brommel, supra*, 56 Cal.2d at p. 632.)

█ Indeed, reliance on a belief induced by police deception is particularly misplaced. While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary (see *People v. Arguello* (1967) 65 Cal.2d 768, 775 [56 Cal.Rptr. 274, 423 P.2d 202]), such deception is a factor which

that a promise of a benefit "need not be expressed, but may be implied . . . ." (*Hill, supra*, 66 Cal.2d at p. 549.) An offer of help "with treatment or . . . what might happen" is of sufficient clarity that further specifications are not necessary to understand the nature of the inducement.

[10]Appellant testified in the following fashion regarding his motivation for making his statement:

"He told me if I would tell him why I hit her that it would be a great load off my chest and that he could possibly help me and of course this is along with his statements about the mental hospital, I didn't want to think I was crazy, I was having a hard time, I was kind of pulling within myself, I didn't want to admit that I was crazy, but because I didn't feel that I was crazy, but as I say again I couldn't see the investigators lying to me; you know, and if twenty some odd people saw me kill them and two girls inside the house saw me kill them, I must have killed them and I wanted help. . . .

"I thought I was sick mentally and I was wanting treatment because . . . I thought I was sick I needed to be put away and I thought the police officers would help me obtain this help."

weighs against a finding of voluntariness (*Atchley* v. *Wilson* (N.D.Cal. 1968) 300 F.Supp. 68, 71, citing *Spano* v. *New York* (1959) 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202]). Also, deception which is "used to make more plausible" a promise of assistance does render a statement inadmissible. (*United States* v. *Murphy* (2d Cir. 1964) 329 F.2d 68, 70; see also *United States* v. *Denno* (S.D.N.Y. 1966) 259 F.Supp. 784.) The surreptitiously taped conversation with appellant's wife shortly before the incriminating statement was made demonstrates that the false information regarding eyewitnesses had caused appellant to doubt his own sanity, and thus made more plausible the police offer of help for any mental problem appellant might have.

■ Indeed, this and other forms of deception, communicated to appellant by his wife, bear heavily on a separate issue raised by appellant, i.e., whether the statements were the product of psychological coercion. This court has concluded that appellant's statements were involuntary due to implied promises of leniency. An examination of other circumstances outside that analytical framework leads us to conclude further that there is evidence of other forms of psychological coercion that raises a strong doubt as to whether appellant's statements were truly volitional.

In determining whether or not an accused's will was overborne, an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041].) The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735].) Statements which are "the product of coercion, either physical or psychological, cannot stand . . . because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Id.*, at pp. 540-541 [5 L.Ed.2d at p. 766].) Also, coerced confessions are of doubtful reliability. (*People* v. *Garner* (1961) 57 Cal.2d 135, 163 [18 Cal.Rptr. 40, 367 P.2d 680] (conc. opn. of Traynor, J.).)

The secretly recorded tape recording of the conversation between appellant and his wife, which occurred shortly before the police interrogation of May 17th, is vivid evidence of the deterioration of appellant's will to resist under the pressure of manufactured evidence of his guilt and suggestions that he committed the crimes while mentally ill. The tone of appellant's voice revealed him to be in a highly emotional state. His wife informed him that the police had said that they had proof that appellant raped Theresa Holland. In fact, no such proof existed, since neither the autopsy performed on Theresa nor the post arrest swabbing of appellant's pubic area indicated recent sexual activity. The provision of false inculpatory information by family members to the accused has been held to be evidence of psychological coercion. (*People* v. *Alfieri* (1979) 95 Cal.App.3d 533, 544-545 [157 Cal.Rptr. 304].)

In the police interrogation that closely followed this conversation, appellant's voice quavered emotionally. Appellant continued to maintain innocence until the officers asked him to remember going in and seeing Theresa and the baby. This question had caused appellant, in the first interrogation conducted the day before, to lose his composure and begin sobbing. Again, the question triggered the same response from appellant. After 30 seconds of sobbing and crying and several more questions, appellant said that he had hit the little baby. In the approximate half-hour of interrogation that followed appellant continued to sob uncontrollably, vomiting at times. Some of his answers to questions during this period were incoherent. Finally, the interrogation was halted by one of the officers because appellant was "not going to get [his] composure back."

The officers arranged a phone call between appellant and his wife which began 10 minutes after the police stopped questioning him. The recording of that conversation shows appellant was still sobbing and semi-coherent. When asked by his wife why he admitted guilt, appellant responded "I don't know. They want to talk to me. . . . I got sick and cold." This conversation also had to be terminated due to appellant's uncontrolled sobbing.

An attorney who saw appellant in court the next morning testified that appellant was crying, moaning, sniffing and sobbing in court. Appellant was unable to answer the attorney's questions, other than to sob and say, "I don't know, I don't know, I'm so confused." When the attorney told appellant not to discuss the case with anybody, appellant said,

"Not even Joe?" Appellant testified that Joe Orman, one of the interrogating officers, was the only Joe he knew in Bakersfield.

The totality of the circumstances surrounding appellant's statements raises a strong doubt as to their volitional character. While no physical abuse of appellant occurred, coercion also includes "the brainwashing that comes from repeated suggestion and prolonged interrogation . . . . [¶] . . . It is a truism of the modern world that when sufficient pressures are applied most persons will confess . . . ." (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 574 [161 Cal.Rptr. 707].) It was repeatedly suggested to appellant that he was unquestionably guilty and that he suffered from mental illness. The certainty of his guilt was suggested by deceptive references to nonexistent eyewitnesses and proof of rape. These came not only from the interrogating officers, but also from appellant's wife. The question of appellant's mental illness was raised by the interrogating officers and again reinforced by appellant's wife and her communication to him that yet another police officer thought he had gone berserk and committed the homicides.

On this evidentiary basis, this court cannot conclude beyond a reasonable doubt that appellant's admissions were "freely self-determined" as required by due process. (See *Rogers* v. *Richmond, supra,* 365 U.S. at p. 544 [5 L.Ed.2d at p. 768].)

█ The determination that appellant's third statement to the police was involuntary affects the admissibility of the two subsequent conversations with his wife. The first conversation, taped over the phone with the knowledge of appellant and his wife, occurred just ten minutes after the completion of the third police interview. The second subsequent conversation took place the following morning at the jail. The rule of law governing repetitions of incriminating statements was stated in *People* v. *Johnson* (1969) 70 Cal.2d 541, 547-548 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366]: "Where an accused makes one confession and then testifies or upon subsequent questioning again confesses, it is presumed that the testimony or second confession is the product of the first. [Citations.] . . . [T]he prosecution has the burden of showing a break in the causative chain. . . ." (See also *People* v. *Jimenez, supra,* 21 Cal.3d at p. 614.) There was no apparent intervening circumstance between appellant's involuntary statement to the police and his subsequent admissions to his wife. Therefore, they are inadmissible.

It is unnecessary to determine whether the statements were full confessions or mere admissions. Even if it is assumed that they were admissions subject to the *Chapman* test of prejudice (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) rather than confessions subject to the per se test of prejudice (see generally *People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]), the error in admitting appellant's third statement to the police and the two subsequent statements to his wife was prejudicial. (Cf. *People* v. *MacPherson* (1970) 2 Cal.3d 109, 115 [84 Cal.Rptr. 129, 465 P.2d 17].) The judgment must be reversed unless the prosecution shows beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman* v. *California, supra*, 386 U.S. 18; *People* v. *McClary, supra*, 20 Cal.3d at p. 230; *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].)

The prosecution case was built on circumstantial evidence from which varying inferences could be drawn. The impact on the jury of hearing appellant's own voice on tape saying "Oh, I killed them" and "I'm a murderer" cannot be underestimated. It is also significant that the jury during deliberations requested transcripts of all taped statements and were provided transcripts of the inadmissible statement to the police and the subsequent telephone call between appellant and his wife. (Cf. *People* v. *McClary, supra*, 20 Cal.3d at p. 230.) Since the error in admitting the statements was one of federal constitutional dimension and cannot be deemed harmless beyond a reasonable doubt, the judgment must be reversed.

## III.

### JURY'S CONSIDERATION OF UNADMITTED EVIDENCE

Although the jury was permitted to hear the May 16th taped jailhouse conversation between appellant and his wife, one portion was excluded by the trial court on the motion of the defense. That portion concerned appellant's unwillingness to take a lie detector test and his wife's comment that appellant would not get out of jail unless he took one:

"CAROLYN HOGAN: Why don't you tell them to give you a lie detector test?

"CARL HOGAN: I want [or possibly I won't] ... I don't want to take one.

"CAROLYN HOGAN: Why?

"CARL HOGAN: Because my word is good, and what if the machine messed up and what if [then, hesitation] they just—you know, there you are. There is too many ifs in one of them. I told them I'd take one, did you realize that?

"CAROLYN HOGAN: I realize your chances are slim of getting out of here without one."

When the tape of appellant's May 16th conversation with his wife was played for the jury during the prosecution's case, the district attorney skipped over this portion because the trial court had ruled that the passage was unduly prejudicial. However, during the first day of deliberation, the jury at 3:20 p.m. requested to hear the tape. The court, without notifying counsel,[11] sent the *entire* tape into the jury room. Later in the afternoon, just before the jury was excused for the day, the trial judge told counsel that the tape had been sent to the jury. After defense counsel reminded him about the inadmissible portion of the tape, the trial judge called in the jury. He found that they had already listened to the tape and excused them at 4:30 p.m.

The next morning, the jury commenced their deliberations at 9:30 a.m. After the court had a colloquy with counsel and sometime before 10:50 a.m., the jury was admonished to disregard that portion of the tape which had previously been excluded.[12]

---

[11]Appellant's contention that the provision of exhibits to the jury without notification of counsel denied him the right to assistance of counsel is considered *infra*, at pages 848-850.

[12]The trial court admonished the jury in the following language:

"Ladies and gentlemen. I have called you in this morning before you get too far in your deliberations to talk to you about the tape recording. People's thirty nine. Late yesterday afternoon you requested and apparently listened to a tape recording that is People's thirty nine. For the record, Mr. Wilkinson indicated it was. You had previously heard that tape during the course of the trial; however, at the time that you heard the tape recording I had previously ordered that a certain part of that tape be omitted.

"Now, through inadvertence, that portion was not omitted when the tape was sent in to you, yesterday. Now, the portion of the tape that I am referring to that I have reference to concerns the defendant's wife asking about a lie detector test and the defendant indicating, and I am going to quote here 'I told them I would take one.'

"Now, that portion was stricken out of the Court and perhaps you remember when

■ It is contended by appellant and conceded by respondent that the jury's receipt of evidence which was not admitted is error which creates a presumption of prejudice to the appellant. (*People* v. *Boyd* (1979) 95 Cal.App.3d 577, 586 [157 Cal.Rptr. 293]; *People* v. *Kitt* (1978) 83 Cal.App.3d 834, 849-851 [148 Cal.Rptr. 447].) This presumption of prejudice may be rebutted only by "proof that no prejudice actually resulted. [Citation.]" (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) Unless the presumption of prejudice is rebutted, the accused is entitled to a new trial regardless of the probability that a more favorable verdict would have resulted absent the error. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 206-207 [155 Cal.Rptr. 657, 595 P.2d 91].)[13] Therefore, the determinative issue is whether there is evidence which rebuts the presumption that a new trial is necessary.

Respondent asserts that the content of the statement, together with the admonition by the trial court, rebuts the presumption of prejudice. The content of the inadmissible statement is asserted not to be of a nature to affect the jury's impartiality. At one point appellant told the police he was willing to take a lie detector test. Respondent contends that this serves to offset his expressed reluctance to take the test which was based on his specific doubts about the reliability of the polygraph.

While various inferences as to appellant's state of mind may be argued from his comments to his wife regarding the lie detector test, the general tenor of the statement is reluctance to submit to such an exami-

---

Mr. Quirk was standing here, I said that there is a part of the tape that isn't material at all and he is going to skip over it. The portion was stricken out because it must not be considered by you in any way in deciding this case. It is the unringing the bell situation that I talked about at the beginning of the case, if you will recall. You have already heard it, because you had it back in the jury room. You must treat it as though you had not heard it.

"Lie detector tests, and I just want to talk generally now about lie detector tests, because the subject was brought up in the tape. Lie detector tests are not reliable and they are not recognized under our law as being reliable. Any discussion by you or any drawing of any inferences by you because of the comments made between Mr. Hogan and his wife concerning such a test would not only be unfair to both the prosecution and to Mr. Hogan, but it would be immaterial and entirely improper, and justice, ladies and gentlemen, would not be done or served, so put that out of your minds and treat it as though you had never heard it.

"Alright. Thank you very much. You can resume your deliberations."

[13]As stated in *People* v. *Martinez* (1978) 82 Cal.App.3d 1, at page 22 [147 Cal.Rptr. 208]: "Convincing evidence of guilt does not deprive a defendant of the right to a fair trial ... includ[ing] among other things the right to an unbiased jury ...."

nation. In *People* v. *Carter* (1957) 48 Cal.2d 737, 752 [312 P.2d 665], this court held that the admission of testimony from which the accused's refusal to take a lie detector test could be implied was error, even in the absence of an objection. (See *People* v. *Schiers* (1971) 19 Cal.App.3d 102, 109 [96 Cal.Rptr. 330].) Other courts have recognized the "horrendous capacity for prejudice" posed by the introduction of evidence of an individual's refusal to take a lie detector test. (*State* v. *Driver* (1962) 38 N.J. 255 [183 A.2d 655, 659].) "In terms of degree of prejudice, the average jury, unfamiliar with the present scientific uncertainty of the tests, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imperfection." (*State* v. *Driver, supra*, 183 A.2d at p. 658; quoted with approval in *Sheppard* v. *Maxwell* (S.D.Ohio 1964) 231 F.Supp. 37, 68-69 (affd. on other grounds (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]); accord, *State* v. *Kolander* (1952) 236 Minn. 209 [52 N.W.2d 458]; *Mills* v. *People* (1959) 139 Colo. 397 [339 P.2d 998].)

Far from rebutting the presumption of prejudice, the content of the inadmissible evidence reinforces the presumption. While some cases have found the presumption of prejudice to be rebutted by the inherently nonprejudicial value of the evidence so considered, these cases are clearly factually inapplicable to the instant case. (See *People* v. *Martinez, supra*, 82 Cal.App.3d at p. 25 [jury's consideration of maps which duplicated evidence already before jury]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 506-507 [116 Cal.Rptr. 217, 526 P.2d 225] [jury's receipt of victim's clothing, to which defense objection was overruled, but which were not moved into evidence by prosecutor].)

. Since the unadmitted evidence received by the jury was not inherently nonprejudicial, the issue remains whether the trial court's admonition is sufficient to prove that no prejudice resulted.

For several reasons, the admonition given in this case does not by itself rebut the presumption of prejudice. First, the nature of the improperly considered evidence is so prejudicial that many courts have held it incurable by admonition alone. (*Bowen* v. *Eyman* (D.Ariz. 1970) 324 F.Supp. 339, 342; *State* v. *Green* (1963) 254 Iowa 1379 [121 N.W.2d 89, 95 A.L.R.2d 810]; *State* v. *Britt* (1959) 235 S.C. 395 [111 S.E.2d 669].) Second, the admonition here cannot be deemed a prompt one for it followed by some 16 hours both the jury's receipt of the evidence and the trial judge's discovery of the error. Third, the admonition

was somewhat one-sided. The admonition to disregard singled out appellant's statement that he would take a lie detector test, while failing to state specifically the need to disregard the portion in which appellant expressed reluctance to take the test.

Finally, although the order for a new trial would be compelled in a noncapital case under the circumstances presented here, the presumption of prejudice from jury contact with inadmissible evidence is even stronger in the context of a capital case. "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." (*Mattox* v. *United States* (1892) 146 U.S. 140, 149 [36 L.Ed. 917, 921, 13 S.Ct. 50]; accord, *State* v. *Britt, supra* [reversing conviction and death sentence *in favorem vitae* where jury learned of defendant's refusal to take a lie detector test].)

IV.

DENIAL OF COUNSEL DURING JURY DELIBERATIONS

■ Appellant contends that he was denied the right to counsel when the trial judge, without notifying counsel, responded to jury requests to see various trial exhibits during deliberations. On February 26, 1979, the jury sent four different notes requesting exhibits. The judge sent all the requested exhibits into the jury room.[14]

The conduct of the trial court in sending in the exhibits without notifying counsel was serious error. Indeed, it has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel. "[A]ll communications should be made in open court.... Ordinary procedure would require that the trial judge afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be

---

[14]The requests were as follows:

Note 1 (10:50 a.m.): "We would like to see all photos in evidence."

Note 2 (1:15 p.m.): "We would like to see Hogan's shirt, shoes and pants, and the wet towel found in the Hollands' bathroom."

Note 3 (1:35 p.m.): "We would like to have the transcripts of all tapes in evidence."

Note 4 (3:20 p.m.): "We would like to hear the first jail tape of the conversation between Hogan and his wife."

deemed irregular." (*People* v. *Alcalde* (1944) 24 Cal.2d 177, 189 [148 P.2d 627]; quoted with approval in *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641]; accord, *People* v. *Weatherford* (1945) 27 Cal.2d 401, 418-420 [164 P.2d 753].)

Failure to notify counsel of the jury's requests for exhibits also violated section 1138.[15] Section 1138 requires jury requests for information to be made in open court after notice to counsel.

A jury request for exhibits during deliberation is a critical stage of the prosecution during which the right to counsel applies. (Cf. *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 985-988 [146 Cal.Rptr. 129] [court's sending of written instructions to jury during deliberation is critical stage].) Exhibits, like testimony, are evidence. The trial court's decision to provide evidence to the jury during deliberations, whether through the rereading of testimony or the provision of exhibits, requires the opportunity for counsel to assist his client. As was held recently in *People* v. *Knighten* (1980) 105 Cal.App.3d 128, 132 [164 Cal.Rptr. 96]: "It is obviously critically important that a defendant and his attorney be permitted to participate in decisions as to what testimony is to be reread to the jury; the essence of the error in this action is its tendency to deprive the defendant of his fundamental constitutional right to the assistance of counsel at this critical stage of the proceedings. [Citations.]"

The question remains whether the denial of assistance of counsel here was prejudicial error requiring reversal. As held by *People* v. *Knighten, supra*, and *People* v. *Dagnino, supra*, 80 Cal.App.3d 981, if the denial of the right to counsel during jury deliberations may have affected substantial rights of a defendant, prejudice is presumed and "[o]nly the most compelling showing to the contrary will overcome the presumption." (*People* v. *Knighten, supra*, 105 Cal.App.3d at p. 133.) The reason for the strong presumption of prejudice when the assistance of counsel has been denied is both the fundamental nature of the right and its relation to a fair trial and the difficulty of a "meaningful assessment of prejudice on the record." (*People* v. *Coffey* (1967) 67 Cal.2d 204,

---

[15]Section 1138 states: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

219 [60 Cal.Rptr. 457, 430 P.2d 15], italics omitted; *People* v. *Dagnino, supra*, 80 Cal.App.3d at p. 988.) When faced with a record of a proceeding conducted without counsel, a reviewing court assessing possible prejudice is compelled to speculate as to what might have occurred had counsel been present. The uncertain nature of such a determination requires the strong presumption of prejudice the above-cited cases have applied.

In the present case, this court need not look far to determine that the presumption has not been rebutted. Once the trial judge informed counsel that he had given the jury the May 16th jailhouse tape, defense counsel quickly informed the trial judge about the inadmissible portion of the tape. Had counsel been properly notified of the jury's requests before the exhibits were sent into the jury room, it is virtually certain that the inadmissible and highly prejudicial material concerning appellant's reluctance to take a lie detector test would never have reached the jury. In these circumstances, the compelling showing necessary to overcome the presumption of prejudice has not been made. The error is of federal constitutional dimension and cannot be deemed "harmless beyond a reasonable doubt." (*Chapman* v. *California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].)[16]

## V.

### THE REMAINING ISSUES

Having concluded that the judgment must be reversed for the reasons stated above, this court does not reach certain of appellant's contentions.[17] However, appellant's claim that he was denied due process by destruction of material evidence must be addressed since appellant contends that the error requires dismissal of the case with prejudice.

---

[16]Cf. *People* v. *Dagnino, supra*, 80 Cal.App.3d 981, 989-990, where prejudicial error was found when written jury instructions were given to the jury without notification to counsel. The Court of Appeal held the error prejudicial because, if notified, counsel might have requested CALJIC No. 17.45, a cautionary instruction which tells the jury to disregard any modifications or deletions contained in the written instructions. The court also determined that "there are undoubtedly other measures, and precautions, able and conscientious counsel could reasonably have taken which 'may have affected' their clients' substantial rights." (*Id.*, at p. 990.)

[17]These contentions include the claim of ineffective assistance of counsel at the guilt phase, the claim that the trial judge permitted harrassing and prejudicial photography of appellant in front of jurors, a claim of prosecutorial misconduct during final argument in the guilt phase, and numerous claims of error relating to the penalty phase.

■ *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], held that an investigative agency must preserve material evidence on the issue of an accused's guilt or innocence. (See also *People v. Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051].) Appellant contends that the sheriff's office had a duty to take fingernail scrapings from Theresa Holland's body.

*Hitch* and *Nation* imposed a duty to preserve material evidence which the police had already obtained. Neither case imposed a duty to obtain such evidence or to conduct any particular tests.[18] (*People v. Cooper* (1979) 95 Cal.App.3d 844, 850 [157 Cal.Rptr. 348].) The police cannot be expected to "gather up everything which might eventually prove useful to the defense." (*People v. Watson* (1977) 75 Cal.App. 3d 384, 400 [142 Cal.Rptr. 134]; see also *Robinson v. Superior Court* (1978) 76 Cal.App.3d 968, 976 [143 Cal.Rptr. 328].)

There might be cases in which this court would impose sanctions for a failure to obtain evidence. But this is not such a situation. Considering the totality of circumstances, especially the extremely short length of Theresa Holland's fingernails, it is highly implausible that the scrapings could have produced favorable evidence on the issue of guilt. (*Hitch, supra,* 12 Cal.3d at p. 649.)

Appellant was not entitled to a dismissal or other relief for the failure to obtain fingernail scrapings from the victim.

■ Appellant also claims error as to certain evidentiary rulings. The first questioned ruling concerns the criminalist, Vernon Kyle, who offered expert opinion evidence on the source of various blood stains on the pants and shoes appellant was wearing at the time of his arrest. Kyle testified in detail regarding the stains. He opined that certain stains were "splatters," caused by blood flying through the air following impact rather than by mere contact with a bloody object. Appellant objected that the criminalist was not qualified by reason of skill,

[18]Appellant contends that this case involves only the duty to preserve evidence—that is, that the body of the victim should have been preserved, just as the breathalyzer ampoule in *Hitch* and the semen sample in *Nation* should have been preserved, presumably until appellant had the chance to take fingernail scrapings and to examine the body for other evidence which might help exonerate him. This contention must be rejected. "[P]rosecutorial agencies have no right to custody of the remains of a deceased; therefore no duty of preservation arises." (*People v. McNeill* (1980) 112 Cal.App.3d 330, 337 [169 Cal.Rptr. 313]; see also Health & Saf. Code, §§ 7100 and 7102 and *People v. Vick* (1970) 11 Cal.App.3d 1058, 1065-1066 [90 Cal.Rptr. 236].)

experience, training or education to render an expert opinion on the subject of the origin of the bloodstains.

Evidence Code section 720 requires a proponent of expert testimony to establish the qualifications of the witness if there is an objection.[19] While a trial court's decision as to the qualifications of a witness will be upheld absent an abuse of discretion (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 646-647 [114 Cal.Rptr. 128, 522 P.2d 688]), error must be found if "the evidence shows that a witness *clearly lacks* qualification as an expert and the judge has held the witness to be qualified as an expert witness." (Jefferson, Cal. Evidence Benchbook (1972) § 29.3, p. 502, italics in original.) Also, the qualifications of an expert must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient. (*Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701 [106 Cal.Rptr. 1, 505 P.2d 193]; Jefferson, *supra* (1978 supp.) § 29.3, pp. 331-332.)

Kyle's qualifications as an expert to determine whether blood had been spattered or transferred by contact were nonexistent. He had never performed any laboratory analyses to make such determinations either in the past or in the present case. He had admittedly received no formal education or training to make such determinations. His background on the subject consisted of viewing some years prior an exhibit, which had since been discarded, prepared by some unknown criminalist which demonstrated patterns of human blood dropped from various heights and angles. Kyle had also read some years prior a book about flight patterns of blood.[20] Also, he had observed bloodstains at many crime scenes, and had determined in his own mind whether they were spatters or "wipes," but had never verified his conclusions in any way. When pressed about his qualifications, he testified as follows:

---

[19]Evidence Code section 720 provides:

"(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

"(b) A witness's special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

[20]McDonnell, Flight and Stain Patterns of Human Blood (1971). Kyle indicated that he was not very familiar with the work and had not referred to it in making his determination in the instant case.

"KYLE: I don't recall any specific training, it's just sort of seeing something given the characteristics of a liquid, it just seemed fairly obvious based on, you know, just general principles of physics and chemistry.

"Q: It would seem fairly obvious to anyone?

"A: I believe it would be."

Kyle's qualifications boiled down to having observed many bloodstains. But mere observation of preexisting stains without inquiry, analysis or experiment, does not invest the criminalist with expertise to determine whether the stains were deposited by "spatters" or "wipes." The situation is akin to that in *Miller* v. *Los Angeles County Flood Control Dist., supra*, 8 Cal.3d 689. In *Miller*, a mechanical engineer with training in hydraulics, hydrology and in evaluating flooding characteristics in hillside areas, was called as an expert witness to testify whether reasonable construction practices would have dictated erection of a retaining wall as part of the design of a hillside residence. Despite the witness' observation of the construction of several hundred residential homes in hillside areas, he was unfamiliar with specific construction practices utilized in flood hazard areas and did not design or recommend such structures. He was found not qualified by the trial court as an expert on the subject of construction practices and this ruling was upheld by this court.

Similarly, in this case Kyle was undoubtedly qualified to testify about whether the stains were blood and about the blood typing of the stains. However, under Evidence Code section 720, he did not demonstrate special knowledge, skill, experience, training or education to testify as an expert on the particular subject of determining whether blood was deposited by flying drops or by surface-to-surface contact.[21]

The next challenged evidentiary ruling concerns evidence of appellant's debts, which was brought out on cross-examination of appellant over his objection. Appellant contends the evidence was more prejudicial than probative. (Evid. Code, § 352.) Appellant testified that he owed $1,800 to a finance company in Oklahoma and over $10,000 to a

---

[21]The criminalist here had performed no experiments and had no reference standards, either self-generated or created by some reputable expert, to study or compare with the evidence in this case.

bank in Oklahoma. Payments of $79 and $260 per month were due on these debts. The trial court admitted the evidence of appellant's debts on the theory that the evidence was probative as to motive for robbery and would not prejudice him.

The rule governing evidence of poverty as motive for crime was stated long ago in *People* v. *Kelly* (1901) 132 Cal. 430, 431-432 [64 P. 563]: "Generally, evidence of the wealth or poverty of a defendant is not admissible; but the sudden possession of money, immediately after the commission of a larceny, by one who before that had been impecunious, is clearly admissible as a circumstance in the case. [Citation.]" Wigmore states a general policy of exclusion of this type of evidence as motive for crime because "the practical result of [admission] would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence." (2 Wigmore, Evidence (3d ed. 1940) § 392, p. 341; *People* v. *Gorgol* (1953) 122 Cal.App.2d 281, 303 [265 P.2d 69].)

In the instant case, details of appellant's immediate cash situation were fully developed by both prosecution and defense in the controversy over the source of the two $20 bills in appellant's possession after his arrest. The fact that appellant and his family were living with relatives and that appellant had received only a single paycheck since coming to Bakersfield was already before the jury.

The evidence of appellant's debts in Oklahoma added little of probative value to the evidence of his financial condition. The prejudicial value of the evidence was to show appellant as a mishandler of money and to create the possible inference that he had left Oklahoma to escape his debts. Because of the general rule against admission of evidence of poverty as a motive for serious offenses and because of the limited probative value of the Oklahoma debts in view of the other evidence of appellant's financial condition, the evidence should have been excluded pursuant to the Evidence Code section 352 objection.[22]

---

[22]The People cite dictum in *People* v. *Morales* (1979) 88 Cal.App.3d 259, 264 [151 Cal.Rptr. 610] that "[p]roof of defendant's need for money has been held relevant and admissible in prosecuting for theft, robbery (*People* v. *Gorgol*, 122 Cal.App.2d 281 [265 P.2d 69]; *People* v. *Orloff*, 65 Cal.App.2d 614 [151 P.2d 288]), ..." The *Morales* dictum is overbroad and unsupported by the cases cited. In *Gorgol*, evidence that an accused was in financial difficulty and had recently stolen his roommate's wallet was admitted only to refute the claim that he would not have committed the robbery

## VI.

The judgment is reversed. The petition for writ of habeas corpus numbered Crim. 21582 is denied as moot.

Broussard, J., concurred.

KAUS, J.—■■ ■■ I concur in the result. Although I do not believe that the offers of police help for Hogan's psychiatric problems amounted to an implied promise of leniency, nevertheless the repeated references to his possible mental difficulties form an essential part of the background which leads me to believe that the admitted police deception which preceded Hogan's incriminatory statements was "of a type reasonably likely to procure an untrue statement." (*In re Walker* (1974) 10 Cal.3d 764, 777-778 [112 Cal.Rptr. 177, 518 P.2d 1129].)

Before explaining my reasoning, several points outlining and defining the framework of the relevant inquiry should be made.

First: once the "historical" facts are reliably determined by the trial court, the question whether the deception is of the kind which invalidates a confession is one of law. (*Haynes* v. *Washington* (1963) 373 U.S. 503, 515-516 [10 L.Ed.2d 513, 521-522, 83 S.Ct. 1336]; *Culombe* v. *Connecticut* (1961) 367 U.S. 568, 602 [6 L.Ed.2d 1037, 1057, 81 S.Ct. 1860]; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal. Rptr. 172, 580 P.2d 672].) Thus, I am willing to assume in favor of the trial court's ruling that it found on substantial evidence that Officer Clendenon did not say, as Officer Orman recalled, that the girls had seen Hogan commit the homicide, but that he merely said that the girls had seen him hitting Jeremy. It does not really matter—either version was admittedly false.

Second: to determine whether police deception is of the kind that is reasonably likely to trigger a false confession, one must, of course, evaluate the deception's probable effect on a person who is, in fact, not guilty. Otherwise a false confession is a rational impossibility.

because he did not need money. (*People* v. *Gorgol, supra,* 122 Cal.App.2d at p. 303.) In *Orloff,* error was found in the admission of evidence that the defendants possessed cash, new clothes and jewelry when arrested, because no evidence of "impecuniousness" prior to the robbery had been shown. (*People* v. *Orloff, supra,* 65 Cal.App.2d at pp. 620-621.) Both *Gorgol* and *Orloff* cited the general policy of exclusion of evidence of poverty as motive. (*People* v. *Gorgol, supra,* 122 Cal.App.2d at p. 303; *People* v. *Orloff, supra,* 65 Cal.App.2d at p. 620.)

Third: the very nature of the test assumes that there are certain deceptive practices which under certain circumstances will cause certain persons to confess falsely: thus it simply will not do to say—as one may be tempted—that there can be no lie which would cause one to make a false confession to a crime as grave as murder.

Fourth: the question—what lie will trigger a false confession—cannot be answered in the abstract. A lie which may provoke nothing but a contemptuous smile on the part of a seasoned criminal may have a devastating effect on an emotionally overwrought individual, with no reservoir of psychological strengths, who has never been in serious trouble with the law.[1] Thus, among many other factors, we must consider the nature of the crime, the suspect's admitted relation to it, his personality in general, relevant character traits in particular, the nature and course of the interrogation apart from the deception—in short, the totality of circumstances.

Fifth: in determining whether the deception was of the kind which was reasonably likely to trigger a false confession, we must of necessity perform a task for which we are not particularly well equipped—the determination how another person, whom we know only through the pages of an appellate record, was likely to act under certain stressful circumstances which none of us has ever experienced. Inevitably this exposes one to the charge of being a "parlor shrink." Yet this is precisely the kind of determination which courts are constitutionally bound to make and do make in case after case involving a claim that a confession was involuntary. As the United States Supreme Court pointed out in *Haynes* v. *Washington, supra,* 373 U.S. at page 515 [10 L.Ed.2d at page 521]: "[W]e cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated."

Sixth: since in this particular area it does matter whether the police conduct is likely to beget a false confession (cf. *Rogers* v. *Richmond* (1961) 365 U.S. 534, 543-545 [5 L.Ed.2d 760, 767-769, 81 S.Ct. 735]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 437-438 [20 Cal.Rptr. 165, 369 P.2d 714]), it seems legitimate to consider just what type of confession follows the deception. Quite apart from the obvious fact that a confes-

---

[1]White, *Police Trickery In Inducing Confessions* (1979) 127 U.Pa.L.Rev. 581, 586: "Trickery that is relatively innocent in one context might have a devastating effect on certain suspects when employed in a different setting."

sion which is independently verifiable is more likely to be true than one which is difficult to reconcile with established facts, it seems to me to be important whether a confession is in rational form or whether it consists of a series of emotional outbursts and explosions and—most vitally—whether it touches upon the main points to which a reliable confession would inevitably refer.

These preliminaries out of the way, I am bound to conclude that the admitted deception was of such a nature as to undermine the reliability of Hogan's confession or—more accurately—that the People have not established its validity beyond a reasonable doubt.[2]

The tapes of Hogan's interrogations and of his conversations with his wife Carolyn reveal him as a weak person, conscious that he has been a failure as a husband, father and provider and very much under the thumb of Carolyn, who displays incredible coolness, strength and clarity of purpose while her world is collapsing around her. In his conversations with Carolyn, Hogan appears to feel that his being arrested for murder is just one more instance of his ineffectiveness as a human being. At the same time there is nothing in his background which suggests any contact with the type of violence which he encountered in the Holland residence. If he was innocent—as we must assume—the sight of the dead Theresa with the gravely injured Adam beside her must have had a cataclysmic effect on his mind. The scene is utterly senseless, yet the very fact that he is alone and observes it suggests some kind of connection.

This totally unprecedented shock is followed by his encounter with Holland, the attempted flight, his arrest, incarceration, and a series of police interrogations. The record clearly shows that during these sessions the police firmly planted in his mind the suspicion that he was "crazy." Perhaps he was, in some fashion, responsible for the pitiful

---

[2]The law is murky on the question whether a confession provoked only by deception which is of a nature likely to procure an untrue statement is classified as "involuntary." It is, of course, well established that deception generally may be one of the factors which renders a confession involuntary. (*Spano* v. *New York* (1959) 360 U.S. 315, 323 [3 L.Ed.2d 1265, 1271, 79 S.Ct. 1202].) In any event, our holding in *People* v. *Jimenez, supra*, 21 Cal.3d 595, 606-608 [147 Cal.Rptr. 172 580 P.2d 672] that the People must prove the admissibility of a confession by proof that convinces beyond a reasonable doubt was in considerable part based on the consideration that this strict rule decreased the possibility that a false confession would be admitted. (*Id.*, at p. 607.)

scene he had witnessed—a scene calculated to trigger guilt feelings in the most innocent spectator.[3] These vague feelings of some kind of responsibility are then confirmed by the information that, indeed, there were witnesses of his having done something which he has no recollection of having done. Was he really crazy? Why would he have done such a thing? He had no reason to kill Theresa, hurt Adam, or hit Jeremy. Significantly, it was not until the police supplied him with a motive of sorts—the robbery of $40—that Hogan literally exploded into admitting that he had hit Theresa and the "little baby."

I have carefully listened to the tape of the interrogation of this "confession" which, in truth, is more like a series of emotional outbursts than a coherent description of the recollection of a past event. The most remarkable aspect of it, however, is that it fails to make any reference whatever to an event which would have been uppermost in the mind of a guilty person: the murder of Jeremy. It is as if the only victims had been Theresa and Adam, the "little baby." Nor is there any reference to Jeremy in any of Hogan's less emotional statements which followed the third police interrogation.[4] I find it impossible to believe that a person who wants to unburden his soul by confessing to a crime or crimes he has actually committed would say nothing about one of two homicides.

In sum: not only were the circumstances such that the police deception was likely to provoke a false confession, but in addition the confession itself—or, rather, its shortcomings—reveal most persuasively that it was, indeed, not a reliable "product of a rational intellect and a free will." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d

---

[3]In his book The Broken Connection (1979), Dr. Robert Jay Lifton describes a psychological phenomenon which he calls "death guilt": "I came to call this kind of memory an *image of ultimate horror*, one involving the dead or dying in a way that evokes the survivor's strongest identification and feelings of pity and self-condemnation. Such imagery tended to involve either people who had been very close to the survivor, or else those (such as children or sometimes women or older people) who are looked upon as most vulnerable and helpless. The image of ultimate horror can symbolize the entire death-saturated event, its horror and pity as well as the survivor's sense of debt and responsibility to the dead. That debt to the dead contains the survivor's unanswerable inner question, 'Why did I survive while he, she, they died?' and is the essence of death guilt." (Pp. 142-143.)

[4]In fact, the only mention of Jeremy in any of the interrogations comes in Officer Clendenon's disputed statement that the girls had seen Hogan hit Jeremy. One additional reason why, as the majority opinion suggests, it is far more probable that Officer Orman's version of Clendenon's statement is correct, is the total absence of any reference to Jeremy in any of the questions and answers that followed.

242, 249, 80 S.Ct. 274]; *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633].) ██ █ It should have been suppressed.[5]

Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. Defendant was convicted of stabbing and bludgeoning to death Theresa Holland and her four-year-old son Jeremy, and attacking her baby, Adam, with intent to murder him. Defendant repeatedly admitted the attacks. Nevertheless, merely because the interrogating officers at one point offered to "help" defendant with any "mental problem" he might have, and because their interrogation later caused defendant to sob uncontrollably and lose his composure as he admitted his guilt, my colleagues hold that defendant's statements were inadmissible as the product of improper promises of leniency and "psychological coercion."

Despite his admitted guilt, justice may well be frustrated by the majority's holding because the remaining evidence against defendant is largely circumstantial. It should be understood that the majority's determination that defendant's statements were involuntary was expressly rejected by the trial court which heard the evidence during an extensive pretrial hearing regarding the voluntariness of defendant's statements. (See Evid. Code, § 402, subd. (b).) Because the trial court's determination was based on conflicting evidence, under well established principles, we "must accept the trial court's resolution of conflicting evidence, unless the evidence . . . is so improbable as to be entirely unworthy of belief. [Citations.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 607 [147 Cal.Rptr. 172, 580 P.2d 672].) This has been our consistent policy. (*People v. Aikens* (1969) 70 Cal.2d 369, 378 [74 Cal.Rptr. 882, 450 P.2d 258]; *People v. Massie* (1967) 66 Cal.2d 899, 914 [59 Cal.Rptr. 733, 428 P.2d 869]; *People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].)

---

[5]Because the erroneous admission of defendant's confession requires reversal, it is unnecessary in my view to determine whether the trial court's errors with respect to the deleted portion of the tape recording were in themselves sufficiently prejudicial to require a retrial; for that reason I do not join parts III and IV of the court's opinion. With respect to part V, I agree that defendant is not entitled to a dismissal or other relief under *Hitch* and that the trial court erred in permitting Kyle to testify as an expert on "blood spattering" and in admitting the evidence of defendant's debts.

## 1. *Promises of Leniency*

Promises of lenient treatment by police officers or other persons in authority will taint admissions or confessions only if the promises were "a motivating cause" of the defendant's statements. (*People v. Johnson* (1969) 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265]; *People v. Hill* (1967) 66 Cal.2d 536, 548 [58 Cal.Rptr. 340, 426 P.2d 908]; *People v. Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].) As we noted in *Johnson*, "If there was conflicting evidence, or if the facts admit of substantially conflicting inferences, the admissibility of the confession might depend on determining what was the motivating cause. [Citation.]" (P. 478.)

In the present case, the evidence regarding the motivation for defendant's inculpatory statements was conflicting. On the one hand, both the testimony of the interrogating officers and the inferences reasonably drawn from the tape-recorded interviews with defendant indicate that he was not motivated in any way by any promises of leniency. Detective Orman testified that before defendant's first and third interviews, the officer advised defendant that if he had a "mental problem," the officer would try to "help" defendant by arranging treatment for him. According to Orman, no specific offers of help or treatment were discussed, and defendant showed neither interest in, nor made any response to, Orman's offer.

Moreover, the transcripts fully support the view that defendant's confession of guilt was not a product of Orman's prior offer of help. The recorded interview during which that confession was made is very illuminating. It reveals that defendant had calmly and consistently denied any complicity whatever in the killings until the interrogating officer first accused defendant of stealing money from Mrs. Holland and then abruptly changed topics and asked defendant to relate what he did after he entered the bedroom "and saw Theresa and the baby." This question apparently triggered a deep emotional response, for defendant lost his composure, began to cry, and immediately thereafter admitted that "I hit the little baby. I don't know, I don't know, I don't know .... I hit her." Defendant's further responses, interspersed with sobbing, included the statement that he "thought" he hit Mrs. Holland with a hammer, and that "I hit her, I hit her and I hit her and I hit her."

Indeed, the majority seems to acknowledge that the officer's prior offer of help was not the motivating cause of defendant's admissions:

"Appellant continued to maintain innocence until the officers asked him to remember going in and seeing Theresa and the baby. This question had caused appellant, in the first interrogation conducted the day before, to lose his composure and begin sobbing. *Again, the question triggered the same response from appellant.* After 30 seconds of sobbing and crying and several more questions, appellant said that he had hit the little baby." (*Ante*, p. 842, italics added.)

In contrast, defendant told the jury that his admissions were motivated, in part at least, by the officer's offer of medical treatment, which defendant said he assumed meant that he would spend some time in a mental institution. The trial court was unimpressed. Yet the majority (*ante*, pp. 839-840) seemingly accepts this testimony at face value, without considering the real possibility that it was pure fabrication designed to fit the legal principles above described.

In any event, it was the trial court's responsibility to resolve the conflicting evidence on the question of motivation. In the present case, following a careful examination of the recorded interviews and live testimony by defendant and the interrogating officers, the trial court concluded that, although defendant may not have deliberately lied regarding his motivation, the reason he "broke down" and confessed was "the type of questions that were being asked at that time," rather than any previous offer of medical assistance. The trial court denied *on this very basis* defendant's pretrial motion to exclude his statements, and accordingly we, in our appellate review, "must accept the trial court's resolution of conflicting evidence ...." (*People v. Jimenez, supra*, 21 Cal.3d 595, 607.)

The trial court was clearly in a better position than are we to decide whether an offer of help or treatment motivated defendant's confession. That is its function. Indeed, several cases from other states uphold trial court rulings on precisely this issue. (*State* v. *Traub* (1962) 150 Conn. 169 [187 A.2d 230, 236] [prior offer of psychiatric treatment not linked to confession]; *Thessen* v. *State* (Alaska 1969) 454 P.2d 341, 346-347 [prior offer of "help" not motivating cause of waiver of *Miranda* rights]; *Townes* v. *Commonwealth* (1974) 214 Va. 683 [204 S.E.2d 269] [officers assured defendant that the courts would "do something" for his mental problem if he were guilty of the offense].) As expressed by the Virginia court in *Townes*, "The trial court was entitled to find that the statement was not made to induce and in fact did not induce defendant's confession." (P. 271.) Likewise, in the present case the trial

court was entitled to find that defendant's inculpatory statements were induced by perfectly legitimate police questioning immediately preceding those statements, rather than by earlier offers of help. The majority's contrary conclusion ignores the conflicting evidence on this issue and erroneously usurps the trial court's proper role in resolving such conflicts.

## 2. Psychological Coercion

The majority's alternative holding is that the officers' interrogation techniques produced a "psychological coercion" which rendered defendant's statements involuntary. (*Ante*, p. 841.) The majority purportedly relies upon "vivid evidence of the deterioration of appellant's will to resist under the pressure of manufactured evidence of his guilt and suggestions that he committed the crimes while mentally ill." (*Id.*, at p. 842.) Having reviewed the record, I am persuaded that the majority seriously misinterprets it and is totally wrong. No coercion of any kind occurred here. Defendant's statements were a product of his free and voluntary choice.

First there was no "manufactured evidence." At most (and the record is in conflict on the point), one of the officers may have told defendant that the Holland daughters saw him commit one of the homicides. Such deception is commonplace during police interrogations and does not render involuntary or inadmissible any admissions thereby produced, as long as the deception was not of a type reasonably likely to procure an untrue statement. (*In re Walker* (1974) 10 Cal.3d 764, 777-778 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People* v. *Felix* (1977) 72 Cal.App.3d 879, 885-886 [139 Cal.Rptr. 366] and cases cited.) The *Felix* case summarizes several of our own cases involving police deceptions substantially identical to that present here, including (1) falsely telling the suspect his fingerprints were on a cash register (*People* v. *Connelly* (1925) 195 Cal. 584, 597 [234 P. 374]); (2) *falsely telling the suspect there were eyewitnesses to his crime* (*People* v. *Castello* (1924) 194 Cal. 595, 602 [229 P. 855]); and (3) telling the wounded suspect that he might not live and therefore should talk to police (*In re Walker, supra*, 10 Cal.3d 879). In all these cases, we held that the suspects' statements were admissible because the deception was not likely to induce an innocent person to implicate himself in the crime. Similarly, as in the *Castello* case, telling defendant herein that there were witnesses to his offense was not likely to induce a false confession.

Likewise, I find no evidence, "vivid" or otherwise, which suggests a "deterioration of appellant's will to resist" confessing. (*Ante*, p. 841.) Certainly, the trial court made no such finding. All that the record shows in this regard is that defendant, upon admitting the offenses, lost control of his emotions and cried during the remainder of the interview. Given the nature of his crimes, which included two bludgeon murders and a brutal attack on a helpless baby, committed by means of a sledge hammer or knife, or both, and the realization that he had been apprehended, such a reaction seems entirely understandable. Being then in custody, tears could be expected, but they most certainly do not inevitably compel the majority's conclusion that defendant was "brainwashed" by police "coercion." (*Ante*, p. 843.) Indeed, at the conclusion of the interview in question, defendant expressly confirmed that the officers had done nothing to harm or threaten him. He agreed that he had begun to cry only because he was recalling what he had done. Moreover, although defendant cried frequently during the last segment of the interview, he nevertheless managed to answer most of the officers' questions coherently and politely ("No sir." "Yes sir." "I don't know sir, I'm sorry.") throughout the remainder of the interview.

In *In re Walker, supra*, 10 Cal.3d 764, 777, we upheld, as voluntary, certain admissions exacted from a suspect who had been struck twice on the head with an officer's gun butt and shot in the shoulder, and who was bleeding "badly" when questioned. We observed that neither an officer's use of reasonable force in arresting a resisting suspect nor the accompanying injuries or pain necessarily rendered his subsequent statements involuntary. Similarly, my review of the record herein convinces me that defendant Hogan, despite his tears, was neither "brainwashed" nor "coerced" but instead voluntarily and competently admitted his complete responsibility for the two murders.

### 3. *Other Errors*

The majority finds two other bases for reversal of the judgment, but, in my view, the asserted "errors" are so minor that only a brief discussion is needed to refute the majority's conclusion. The majority first finds reversible error in the court's inadvertence in allowing the jury to hear a tape recording in which defendant explained to his wife why he had declined to take a lie detector test. Defendant simply observed that, although he had originally agreed to take such a test, he now believed that "my word is good, and what if the machine messed up .... There is too many ifs in one of them ...." This explanation afforded a per-

fectly rational, understandable reason for defendant's refusal to take a test. No reasonable juror could have drawn any adverse inferences from defendant's explanation. This was not reversible error.

The majority likewise would reverse the judgment because the trial court allowed the jurors to view certain trial exhibits during their deliberations without first notifying counsel. With due respect, I believe that it is simply inconceivable that such "error" adversely affected any of defendant's "substantial rights" (see *People* v. *Knighten* (1980) 105 Cal. App.3d 128, 133 [164 Cal.Rptr. 96]), for the only exhibit subject to possible objection was the foregoing tape recording disclosing defendant's refusal to submit to a lie detector test, a matter wholly harmless under the circumstances here.

I would affirm the judgment.

Mosk, J., concurred.