[No. A110124. First Dist., Div. One. Aug. 8, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFTON TERRELL, JR., Defendant and Appellant.

COUNSEL

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Moona Nandi and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MARGULIES, J.—A jury convicted defendant Clifton Terrell, Jr., of murder and robbery charges arising from a fatal shooting in the course of an attempted street robbery. Defendant contends that his conviction resulted from the improper admission of a secretly recorded telephonic confession he made to family members immediately after confessing to police. Although the police confession was later found to be involuntary and excluded from evidence, we find no error in the admission of defendant's ensuing admissions to family members, and affirm the judgment.

## I. BACKGROUND

Defendant was charged by information with the murder of Hunter McPherson (Pen. Code,[1] § 187; count 1), robbery of Alexa Savelle (§ 212.5, subd. (c); count 2), attempted robbery of Hunter McPherson (§§ 664, 212.5, subd. (c); count 3), robbery of Wenyun He (§ 212.5, subd. (c); count 4), attempted robbery of Zhao Li (§§ 664, 212.5, subd. (c); count 5), robbery of Jeremy Molinaro (§ 212.5, subd. (c); count 6), and robbery of Davida Froehlich (§ 212.5, subd. (c); count 7). The information further alleged: as to each count that defendant committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), as to counts 1 and 3 that defendant personally and intentionally discharged a firearm, which proximately caused the death of Hunter McPherson (§ 12022.53, subd. (d)), and as to counts 2, 4, 5, 6, and 7 that defendant personally used a firearm (§ 12022.53, subd. (b)). As to count 1, the information alleged as a special circumstance that the murder was committed during the commission of an attempted robbery (§ 190.2, subd. (a)(17)). On September 21, 2004, the trial court granted defendant's section 995 motion to set aside the gang allegations. Defendant pleaded not guilty and denied the allegations.

Codefendant Dwayne Reed was charged with the same counts and allegations, with the exception of the section 12022.53 allegations pertaining to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

counts 1, 2, and 3. Reed was also charged with being a felon in possession of a firearm (§ 12021, subd. (a)(1); count 8), and with prior strike convictions (§§ 667, subds. (d), (e), 1170.12, subds. (b), (c)), a prior serious felony conviction (§ 667, subd. (a)), and with having served a prior prison term within the last five years (§ 667.5, subd. (b)). On October 1, 2004, Reed entered into a plea agreement under which he pleaded guilty to being an accessory after a murder (§ 32), grand theft from Wenyun He (§ 487, subd. (c)), and the robbery of Davida Froehlich (§ 212.5, subd. (c)). Reed also admitted a prior conviction allegation. All other charges were dismissed as part of the agreement, which was conditioned on Reed providing truthful testimony in the case against defendant.

Defendant's jury trial commenced on January 20, 2005.

## A. *Prosecution Case*

### 1. *Li/He Robbery*

A few minutes after 1:00 a.m. on November 17, 2001, Zhao Hui Li was walking her friend, Wenyun He, to his car, which was parked near Li's residence on Bay Street in San Francisco. She left her purse in the apartment and took her key. Before they reached the car, two men stopped them. One of them said to Li, "Give me the money." The man was standing two or three feet away, pointing a silver gun at Li's stomach. While Li repeatedly told the man she had no money, she saw that the second man was pointing a gun at He and demanding money from him. He pulled out his wallet to give to the second robber. The man grabbed it from him and both men ran off.

### 2. *Froehlich/Molinaro Robbery*

Davida Froehlich and Jeremy Molinaro left a music event at the Gift Center at Eighth and Brannan Streets a little after 1:30 a.m. on November 17, 2001, and walked to a nearby lot where they had parked their car. When they reached their car, two men approached them. One of the men said to Froehlich, "Give me your money." The man was holding a black gun at waist level pointed toward her stomach. Froehlich told him she only had a dollar and offered him her purse. The man demanded her watch instead, and she gave it to him. The other man approached Molinaro and said, "Freeze. . . . This is a stickup." Molinaro did not believe him at first and said, "Show me the weapon." Froehlich said to Molinaro, "Quit being an effin' smartass and give him the money." The robber pulled a black semiautomatic gun from his jacket, stepped forward, and pressed it against Molinaro's stomach. The man patted down Molinaro's pockets, finding approximately $160. After taking Molinaro's money, both men ran off.

### 3. *McPherson/Savelle Robbery and Murder*

Sometime between 1:30 a.m. and 2:00 a.m. on November 17, 2001, Alexa Savelle and Hunter McPherson left a friend's house to walk the four or five blocks home to their Potrero Hill apartment. As they walked on Mariposa Street, a man approached from behind and asked McPherson for his wallet. When they turned around, Savelle saw a man with a gun standing about three or four feet away. He said to McPherson, "Give me your fucking wallet," and extended his arm with the gun pointed at McPherson's chest. McPherson said, "No." When the man repeated his demand, McPherson again said, "No." Savelle was not sure if the gunman asked McPherson for his wallet a third time. After demanding McPherson's wallet two or three times, the gunman turned to Savelle and asked her for her purse while pointing the gun toward her chest. Savelle held her purse out and the man grabbed it out of her hand. The gunman turned back to McPherson and again asked McPherson for his wallet a couple of times, while pointing the gun at him, and McPherson refused each time. Neither Savelle nor McPherson said anything else to the gunman or made any move toward him. After McPherson's final refusal, the man shot him in the chest and fled. McPherson fell to the ground. After speaking to McPherson momentarily, Savelle ran to a nearby residence to ask that someone call 911. McPherson died at 5:30 a.m. at San Francisco General Hospital. The cause of death was hemorrhagic shock due to the gunshot wound in his chest.

The police found no bullet or casing at the scene. A bullet was recovered from McPherson's body. Based on an examination of McPherson's body and the clothing he was wearing at the time of the shooting, the medical examiner concluded that the bullet was not fired at close range. There was no evidence of gunshot residue on McPherson's hands.

Savelle described the gunman as 5 feet 11 inches, 170 to 180 pounds, medium build, dark brown hair, brown eyes, darker skin, possibly wearing a mustache, but no other facial hair. She thought the man was "possibly Hispanic" or "African-American/Hispanic." Savelle had worked with a police artist on November 17 to produce a sketch of the gunman. At trial, Savelle compared the artist's sketch to photos of defendant and Reed. She thought the sketch looked more like the photo of defendant. The gunman's hairstyle, skin tone, apparent age, and facial hair were all similar to defendant's, as depicted in the photo.

### 4. *Defendant's Confession and Telephonic Statements*

On November 28, 2001, Inspector Thomas Cleary interviewed Reed in the police homicide office. Reed said he drove the getaway car to and from the

crimes against McPherson and Savelle. The next day, Reed told Cleary that he was also involved in the robbery of an Asian couple near Pier 39 and of a Caucasian couple at Eighth and Townsend in the early morning of November 17.

After Reed's interview, defendant was brought to the same interview room later on the evening of November 28, 2001. The room was equipped with a hidden videocamera and microphone. The police questioned defendant for about one and one-half hours. After first refusing to answer questions, defendant eventually admitted his involvement in a robbery and shooting on Mariposa Street. He told police that he was driving down the street, saw a couple walking past, and got out and demanded their money. The man showed no fear of the gun, causing defendant to be afraid. When defendant snatched the woman's purse, the man ran up to him and grabbed the gun, causing it to fire. Defendant stated repeatedly that he did not mean to kill the man. Defendant admitted that he also committed a robbery at the "Wharf" and another robbery across from the Sega Center shortly before the shooting on Potrero Hill. When the interviewers told defendant that Reed had already admitted his involvement, defendant twice described how he and Reed drove around San Francisco and committed the robberies.

At the conclusion of the interview, defendant asked if he could call his mother. The officers agreed to get a telephone for him. When defendant dialed the number for his mother, the officers left the room and closed the door. One of the officers went to turn the recording equipment off when he left the room but, after hearing some of defendant's statements on the telephone, he changed his mind and continued to record defendant's conversations.

Defendant spoke to four family members, starting with his mother. He stated during the calls that he accidentally shot and killed "the Senator's son"[2] while trying to rob him. He repeated several times that somebody had "snitched" on him and described how the shooting occurred as follows: "I tried to rob him and he wasn't going for it, so I was ready to run from him, so then I snatched his girlfriend [sic] purse. I was about to run, I'm backing up and he tried to rush me and he grabbed the gun and it went off. I didn't mean to kill him. I didn't." Defendant was highly emotional during the call, sobbing at times, professing his love for his family, and telling his mother that he was sorry for not listening to her.

Before trial, defendant moved to suppress all of the tapes and transcripts of his confession and telephone call home. The prosecution chose not to dispute

---

[2] Defendant had learned from television coverage that the shooting victim was the son of a California state senator.

whether the police obtained defendant's confession in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), but argued that his telephonic statements were nonetheless admissible. The trial court found that defendant's statements to police were inadmissible under *Miranda* and under *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (right to counsel), and that his waiver of rights and confession were coerced.[3] The court ruled that the tapes and transcript of defendant's telephonic statements were admissible because they were not the product of coercion or a custodial interrogation.

A videocassette of defendant's telephone call to his mother and other relatives was played for the jury, and a transcript of the call was placed in evidence.

### 5. *Reed's Testimony*

Reed met defendant in February or March 2001. Defendant was "[h]alf Mexican and half black." Reed and defendant became friends and would hang out together smoking marijuana and taking ecstasy pills. They also drank "Hennessy" or "Remy" together.

On Friday, November 16, 2001, Reed was "hanging out on Potrero Hill." He spent the day selling crack. That night, he continued to sell crack while he smoked marijuana and took ecstasy pills. Around 11:00 p.m. or 12:00 a.m., Reed was driving in the neighborhood when he spotted defendant. Reed said, "Come on. Let's go. I got one for us," referring to committing a robbery. Reed and defendant drove around San Francisco for a while, smoking marijuana and taking ecstasy pills. They ended up at Pier 39 where they parked the car and walked around looking for someone to rob. They pulled out their guns and robbed an Asian man and woman who were walking down the street. Reed did not get anything from the woman, but defendant took the man's wallet. The man ran after them for a few blocks. Reed and defendant returned to their car and left the area. Afterward, they divided up the money in the man's wallet and tossed the wallet out of the car.

Reed next recalled stopping near a parking lot across from the Sega Center because they saw a crowd of people coming out. They entered a darkened parking lot looking for someone to rob, and went up to a man and woman as they were about to enter their car. The woman gave Reed her watch, but Reed could not see what defendant was doing with the man. Afterward, Reed and defendant talked about how little they got from the robbery. Reed later gave the watch to his wife.

---

[3] At the preliminary hearing, the magistrate had ruled that defendant's confession to police was obtained in violation of *Miranda*, but was not involuntary. The magistrate ruled that defendant's telephone call was admissible.

From the second robbery scene, Reed drove toward Potrero Hill. As he drove up the hill, he stopped to let defendant out of the car because they had seen a White couple walking down the hill. Reed told defendant, "This one on you," meaning defendant had to "rob these people by his self." Defendant got out of the car. Reed drove a short distance away, stopped, and kept the car running with the lights off. As he waited for defendant, he heard a gunshot from behind him. Less than a minute later, defendant arrived back at the car, holding his gun and a purse. He jumped into the car, and they drove off. Defendant told Reed that the man had tried to grab the gun from him and it went off. Later, they used lighter fluid to burn the contents of the purse, and Reed gave the purse to his wife.

## B. *Defense Case*

Defendant testified in his own defense. He turned 18 less than a month before the McPherson murder. His mother is "Mexican and Indian," and his father is Black.

By mid-November 2001, defendant was using seven to 10 ecstasy pills a day, as well as smoking marijuana and drinking. On November 16, he had been up for three days and had eaten only candy and junk food during that time. That night, defendant and two other friends, Mister Allen and Bernard Hayes, went with Reed to find some ecstasy. After buying the pills, they stopped at a liquor store where one of the men bought defendant a bottle of Hennessey. Defendant took an ecstasy pill, and drank Hennessey and smoked marijuana as they drove around Hunter's Point and the Fillmore District.

Defendant could feel that his body was "ready to shut down," and then he passed out in the car. Reed woke him when they were back on Connecticut Street. Defendant was in the back of the car, and Allen and Hayes were gone. Defendant was groggy as Reed shook him awake. Reed said, "Your stupid ass let dude grab the gun, and you shot him." Defendant did not know what Reed was talking about. He did not have a gun with him in the car and did not see anyone else in the car with a gun. When defendant asked Reed what he was talking about, Reed told him he had tried to rob somebody and that defendant shot the man when he tried to grab defendant's gun. Reed sounded angry with defendant and ordered him out of the car. Although defendant did not believe he shot anyone, he got out of Reed's car and went to a friend's house to sleep.

Later that day, defendant learned from a television news report that a senator's son had been shot on Mariposa Street. He became concerned because the suspect was described as a young Latino male. A police sketch he saw in a later newscast resembled him in certain ways. Although he did not remember a shooting, he became scared that he might have done it.

When defendant spoke to his mother after his arrest, he was distraught and thought it was possible that he had shot someone and failed to remember it. The information he relayed to his mother came from what Reed had told him. At that time, defendant was afraid and thought he was going to get the death penalty. When he spoke to his mother, he believed that he was the person who killed McPherson but he had no memory in his head of doing it at the time, or when he testified at trial.

## C. *Verdict and Sentencing*

The jury found defendant guilty of the murder and attempted robbery of McPherson and the robbery of Savelle, and found true the enhancement allegations associated with these counts, including the special circumstance allegation. The jury found defendant not guilty of the robbery of Molinaro and Froehlich, and could not reach a verdict as to the robbery of He and Li. The trial court declared a mistrial as to the latter counts, and then dismissed the charges on the prosecutor's motion.

The trial court sentenced defendant to life without the possibility of parole on count 1 with a consecutive term of 25 years to life for the personal gun use enhancement in count 1. The court imposed concurrent terms for count 2 and stayed imposition of sentence on count 3. Defendant timely appealed.

## II. DISCUSSION

Defendant contends that the trial court committed reversible error by admitting his telephonic confessions to his mother and other relatives into evidence. According to defendant, these conversations were inadmissible because they were the direct result of unlawful police interrogation tactics which led first to his coerced confession to the police and then, immediately afterward, to his emotional telephonic confession to his family. Defendant asserts that exclusion of the telephonic confession was required in order to protect his Fourteenth Amendment right to due process, Sixth Amendment right to counsel, and Fifth Amendment privilege against self-incrimination.

## A. *Events Preceding Telephonic Confession*

The following facts are drawn from the transcript of defendant's interview by police and from the evidentiary hearing held on his motion to suppress his confession and telephonic statements:

When defendant was taken to the homicide interview room on November 28, 2001, he could not see any cameras or microphones in the room, and the police did not tell him that his statements would be recorded. He admitted

that he had been arrested several times in San Francisco, beginning at age 13. When he had made statements in the past, he could see the tape recorder in front of him.

Defendant had been arrested a few days earlier for violating a court order committing him to a residential drug treatment program. His interview by Inspectors Gordon and Cleary began at 8:45 p.m. on November 28. The inspectors told defendant that their questioning was "nothing to be scared of." Cleary advised defendant of his *Miranda* rights. Defendant agreed to let the inspectors talk to him.

Gordon began by questioning defendant about some gang shootings on Potrero Hill. Defendant told the inspectors that he did not want to talk and repeated that position five more times as Gordon continued to pose questions about the gang shootings.

After a few minutes of this, Gordon said, "Let's talk about Mariposa Street." Although the inspectors did not mention that Mariposa Street was the scene of the McPherson shooting, Gordon hinted to defendant a few minutes later that he was being questioned about a homicide, and that this might be his last opportunity to tell his side of the story. After the subject of "Mariposa Street" was raised, defendant stated nine more times that he did not want to talk, and asked to be brought "back upstairs." The inspectors agreed to do so in "a couple [of] minutes," but continued questioning defendant about other subjects before returning to the subject of their investigation. Gordon told defendant that he was in "serious trouble," and that there were "very serious" allegations against him, but that the inspectors could not discuss them with defendant because he had refused to talk. Gordon told defendant they could only discuss the allegations if he said, "I'd like to reopen the conversation." Defendant then stated, "I'd like to reopen the conversation."

The inspectors told defendant that it was alleged he was involved in a homicide and that a "young lady" had identified him as the shooter from a photo. Defendant disclosed to them that he was worried about receiving the death penalty. They urged him to tell the truth and give his side of what happened. Cleary stated, "[O]ur job is to just help with the truth so that we can move forward here." Gordon said they needed the truth so they could "go back to the district attorney—[¶] . . . [¶] . . . and tell him—[¶] . . . [¶]—something."

Defendant said that he did not want to say anything "that's gonna get me in any type of way, oh, time or nothin'." Gordon responded that defendant was "already in trouble" and that this was the time to "clear it all up." Defendant stated he was ready to speak. He stated: "Man, all I want to know,

if I speak, if I was to be convicted of anything, would I get lesser time? Because I don't—if that's the case, I might as well just fight it . . . to the end . . . ." Gordon told defendant that he could not "promise [him] anything," but that "what we can do is speak for you to the district attorney, and tell the district attorney how . . . sorry you are. [¶] . . . [¶] [and] that you cooperated fully with us . . . ."

Gordon told defendant, "[W]e know that you [had] a gun, we know that you took the purse, we know that you asked the guy for his wallet and we know that it went bad . . . . [¶] And we know that you didn't mean to pull that trigger, did you?" Defendant responded that he did not mean to pull the trigger, and proceeded to confess to robbing Savelle of her purse, attempting to rob McPherson of his wallet, and accidentally shooting McPherson when he grabbed his gun. The inspectors then elicited more details about the crimes from defendant. Defendant told the inspectors that he was "scared to death" and commented four times that he hoped he would not get the death penalty and did not want to die. Defendant also confessed to his role in the two other robberies that night, and eventually implicated Reed in the crimes, after first claiming that he acted alone in committing the crimes. Defendant asked the inspectors to try to get him a manslaughter charge. He said he could not imagine spending life in prison, but knew "if I didn't come clean, it was gonna haunt me forever." At one point, defendant told the inspectors, "I know I was gonna lose that trial anyway, I just decided to get this off my chest, and . . . that is the truth. . . . [¶] Shit, this shit is haunting me. I swear to God, this shit is haunting me."

After putting details on a map of the scene of the McPherson shooting at the inspectors' request, defendant stated: "Man, could I call my Mom and tell her I love her today, because I know they said the phones was off. Could I at least do that? Because I know I ain't seeing her for hell o' long. [¶] Could I get that at least, please? Please, could I get that? Could I get that?" The inspectors agreed, and brought defendant a telephone for him to use. Defendant admitted at the hearing on his motion to suppress that it was his own idea to make the call to his mother, and that the interviewers did not do anything to suggest that he make such a call.

Defendant began the conversation with his mother as follows: "Momma, man, I love you. [¶] C.J. [defendant's nickname]. Man I'm gonna be gone for a while, Momma. [¶] Man, please don't stress, please, man, I can't take no more, but I'm gonna be gone for a while, probably get life. [¶] Momma, please don't cry, please. [¶] Man, the Senator's son. [¶] Man, somebody snitched on me. I didn't mean to do it, though. I didn't. He, he tried to grab the gun and I pulled away and it went off, and then the inspectors just came

to get me, somebody snitched on me." Defendant repeated the substance of these statements to the three other relatives he spoke with on the phone while in the interview room.

## B. *Analysis*

The trial court found that defendant's confession to the police was inadmissible in the prosecution's case-in-chief because the inspectors continued to question defendant after he invoked his right to remain silent. The court further held that the confession was involuntary, explaining its decision in relevant part as follows: "You have an 18-year-old who is obviously very concerned and worried about the death penalty that is discussed. Police say they can't make any promises, but they will speak to the District Attorney, tell them that he cooperated and he felt sorry. [¶] And they said that after he first said he didn't want to talk unless he thought it would do him some good. [¶] So . . . under the facts of this case . . . I do think it is an involuntary confession." At the same time, the trial court ruled that defendant's telephonic statements to his mother and others were admissible because they were not elicited by police in the course of a custodial interrogation and defendant initiated the calls on his own volition without prompting or influence by the police.

Without conceding that defendant's confession to police was involuntary, the People do not ask this court to review the trial court's ruling on the issue. We have therefore assumed for purposes of our analysis that the trial court ruled correctly on the voluntariness issue. Nonetheless, we agree with the trial court's ruling that defendant's telephonic statements were admissible even if his confession under police interrogation was not.

Defendant relies primarily on *People v. Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93] (*Hogan*) (disapproved on another point in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]). The defendant in *Hogan* was convicted and sentenced to death for murdering two members of a coworker's family. (*Id.* at pp. 820–822.) On automatic appeal to the California Supreme Court, defendant challenged the admission of a statement he made to police and subsequent statements he made to his wife. (*Id.* at p. 834.) He argued that his confession to the police was coerced from him by promises of help, false representations regarding the strength of the evidence against him, and suggestions by the interrogating officers that he had committed the crimes while mentally ill. (*Ibid.*) He challenged the ensuing statements he made to his wife on the ground that they were tainted by the illegality of his original confession to police. (*Ibid.*)

The pertinent facts in *Hogan* were as follows: The police interrogated Hogan three times beginning shortly after his arrest. (*Hogan, supra,* 31 Cal.3d

at p. 835.) During the first two interviews, he denied culpability for the crimes. (*Id.* at pp. 835–836.) After the second interview, Hogan was permitted to see his wife on two occasions, and both times their conversations were secretly recorded. (*Id.* at p. 836.) Hogan again denied committing any crimes, but he began to express uncertainty about whether he committed the homicides and whether he was crazy. (*Ibid.*) In their second conversation, Hogan's wife conveyed false information about the crime the police had provided to her, and suggested to him that she thought most of the facts pointed to his guilt. (*Id.* at pp. 837, 842.)

Hogan was interviewed by police a short time later, and made incriminating statements. (*Hogan, supra,* 31 Cal.3d at p. 838.) Ten minutes after this interview concluded, Hogan was allowed to telephone his wife. (*Id.* at p. 828.) Both Hogan and his wife were advised that the conversation was being recorded. (*Ibid.*) Before she spoke to her husband, the police told Mrs. Hogan that he had admitted responsibility for the murders. (*Ibid.*) Hogan made further incriminating statements during the telephone conversation, and in a visit with his wife that was secretly recorded the next day. (*Id.* at pp. 827, 829.)

In a lead and concurring opinion, four justices agreed in *Hogan* that the defendant's original confession to the police was involuntary, although they did not agree about the factual grounds for so holding. (*Hogan, supra,* 31 Cal.3d at p. 843 (lead opn.); *id.* at p. 855 (conc. opn. of Kaus, J.).) As to the court's further ruling that Hogan's statements to his wife were tainted by the confession he made to police, the lead opinion analyzed this issue in a single paragraph: "The determination that [Hogan's] third statement to the police was involuntary affects the admissibility of the two subsequent conversations with his wife. The first conversation, taped over the phone with the knowledge of [Hogan] and his wife, occurred just ten minutes after the completion of the third police interview. The second subsequent conversation took place the following morning at the jail. The rule of law governing repetitions of incriminating statements was stated in *People v. Johnson* (1969) 70 Cal.2d 541, 547–548 [75 Cal.Rptr. 401, 450 P.2d 865] [(*Johnson*)]: 'Where an accused makes one confession and then testifies or upon subsequent questioning again confesses, it is presumed that the testimony or second confession is the product of the first. [Citations.] . . . [T]he prosecution has the burden of showing a break in the causative chain. . . .' [Citation.] There was no apparent intervening circumstance between [Hogan's] involuntary statement to the police and his subsequent admissions to his wife. Therefore, they are inadmissible." (*Hogan,* at p. 843.)

The concurrence in *Hogan* did not specifically address the admissibility of the defendant's statements to his wife. The People ask us to infer from this

that the concurring justices did not join in the lead opinion's holding that these statements were tainted by the defendant's earlier confession to police. If fewer than four justices joined in the lead opinion's holding on that point, it would not be binding on us. (See *People v. Karis* (1988) 46 Cal.3d 612, 632 [250 Cal.Rptr. 659, 758 P.2d 1189] [plurality opinion not joined in by majority is not binding precedent].) But no such inference of nonjoinder is warranted. The concurring justices were careful to specify their points of departure from the lead opinion. (*Hogan, supra*, 31 Cal.3d at pp. 855, 859, fn. 5 (conc. opn. of Kaus, J.).) Had the justices rejected the holding of the lead opinion as to the defendant's statements to his wife, they would not have concurred in its result, which held all of defendant's postconfession incriminating statements to be inadmissible. Nonetheless, we do not find *Hogan* to be controlling in this case.

In *Hogan*, the police consciously used Hogan's wife to support their efforts to elicit incriminating statements from him. Hogan was first permitted to visit with his wife after the police had made two unsuccessful attempts to obtain a confession. The police arranged for both visits to take place in a room where the conversations could be secretly recorded. By at least the second visit, Hogan's wife had been primed with information about the crimes, some of it false, that caused her to believe he was probably guilty. The police followed up the second visit with the interrogation in which Hogan first confessed to the crimes. From Hogan's point of view, the telephone call with his wife afterward was little more than a continuation of his police interrogation since he knew the police were recording it. In fact, the police had let Hogan's wife know that he had just confessed before permitting her to speak with him and recording their conversation. Thus, the hand of the police was evident in all of Hogan's conversations with his wife during this time period. Whether wittingly or unwittingly, Hogan's wife acted as an arm of the police, allowing them to continue to interrogate Hogan by means of questions posed by her. This was confirmed in the face-to-face conversation between Hogan and his wife on the morning following his confession to police. At that meeting, under questioning by his wife, Hogan stated that he still did not know whether he had committed the crimes, telling her at one point, "[Y]ou keep asking me and I keep telling you I don't know. You're just like 'em." (*Hogan, supra*, 31 Cal.3d at p. 829.)

Thus, the facts in *Hogan* were that the police deliberately exploited Hogan's initial confession by setting up follow-up conversations in which his wife could elicit further incriminating evidence from him. In that fact pattern, the court understandably looked to the legal presumption applicable when an accused " 'makes one confession and then . . . *upon subsequent questioning* again confesses.' " (*Hogan, supra*, 31 Cal.3d at p. 843, quoting *Johnson, supra*, 70 Cal.2d at p. 547, italics added.) The "subsequent questioning" referred to in *Johnson* was the continued questioning of an accused *by police*

on the day after he first confessed. (*Johnson,* at p. 549.) The presumption in that circumstance was that the second confession was the product of the first, illegally obtained confession, which presumption could only be overcome by evidence of a break in the causative chain. (*Id.* at p. 547.) *Hogan* simply extended that principle to a fact pattern in which the police used the accused's wife to carry out the subsequent questioning.

No comparable facts are presented here. It was entirely defendant's idea to call his mother. The police interviewers did nothing to prompt the call, nor had they contacted defendant's mother or shared any information with her about the crime to which he had confessed or the evidence against him. The interviewers did not tell defendant or his mother that they would be listening to the conversation or recording it. From defendant's point of view, the coercive atmosphere of the interrogation had ended, and he was having a private call with his family. Defendant's motivation in speaking to his family was entirely different from his motivation in confessing to the police. He was not seeking to avoid reprisals or obtain more lenient treatment, but to talk to people who knew and cared about him, and to be comforted about the situation he was in.[4] He admitted that he alone decided what to say during that telephone call to his family.

Since no coercion or police prompting was used to elicit defendant's telephonic statements to his family in this case, it may be questioned whether the presumption applied in *Hogan* and *Johnson* has any relevance to its admissibility. But even assuming that such a presumption applies, the prosecution overcame it in this case by establishing an "intervening circumstance" that broke the causative chain, namely, defendant's voluntary decision to telephone his family and confess the crime to them. Thus, we do not find the result in *Hogan* to be controlling in this case.

 The following frequently cited language from *United States v. Bayer* (1947) 331 U.S. 532 [91 L.Ed. 1654, 67 S.Ct. 1394] provides a more useful framework for our analysis: "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. *In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.*" (*Id.* at pp. 540–541, italics added.) Thus, the question under *Bayer* is whether the

---

[4] Defendant testified as follows about his reason for calling home: "I just confessed to that crime and, basically, I needed somebody to talk to who I knew cared about me, or something, because I felt all alone."

coercive conditions that produced defendant's initial confession to police still existed when he made his telephonic confession to family members.

■ As an initial matter, the telephonic conversation did not take place under conditions constituting a custodial interrogation or its functional equivalent. In *Arizona v. Mauro* (1987) 481 U.S. 520 [95 L.Ed.2d 458, 107 S.Ct. 1931], the court held that allowing the defendant to speak to his wife, at her insistence, was not a psychological ploy amounting to continued interrogation, even though the police had anticipated the possibility that the defendant would incriminate himself when speaking with her. (*Id.* at p. 528.) The court stated, "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." (*Id.* at p. 529.) Although custodial interrogation for *Miranda* purposes may include acts or ploys by police that amount to the " 'functional equivalent' of questioning" (*Rhode Island v. Innis* (1980) 446 U.S. 291, 302 [64 L.Ed.2d 297, 100 S.Ct. 1682]), merely acquiescing in defendant's unprompted request to call his family is not such an act. Moreover, there can be no coercion for *Miranda* purposes when the defendant is subjectively unaware of any police involvement in eliciting or recording his statements. (*People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540 [2 Cal.Rptr.2d 750] [no Fifth Amendment violation when police secretly recorded defendant's voluntary calls to crime victim who had been prompted by police to ask certain questions].) A fortiori there can be no violation when the police secretly record statements that they had no role in eliciting.[5]

■ Second, defendant's confession to his family was not tainted by the involuntary confession he had just made to police. "A subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained. [Citation.]" (*People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992].) An independent intervening act by the defendant or a third party breaks the causal chain and helps to establish that the second confession was not obtained by exploiting the illegality of the first. (*Ibid.*)

■ The totality of the circumstances leading up to defendant's telephonic statements show that defendant initiated the call and made the statements of his own free will. He was not motivated by any desire for help or leniency from the police, but solely to obtain emotional support and comfort from his family. The police might have hoped that defendant would make incriminating statements if they acceded to his request to speak to his family, but they

---

[5] Defendant offers no separate argument or analysis in support of his claim that use of the telephonic confession violated his Sixth Amendment right to counsel. Absent evidence that the police deliberately enlisted the help of defendant's family to obtain the confession, defendant has no colorable Sixth Amendment claim. (See *People v. Frye* (1998) 18 Cal.4th 894, 993 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

did not suggest the call or attempt to influence its contents. Defendant's telephonic confession was not tainted because the police did not obtain it by any deliberate exploitation of his first confession.

The trial court properly admitted evidence of defendant's telephonic statements to his family.

## III. DISPOSITION

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.

A petition for a rehearing was denied August 30, 2006, and appellant's petition for review by the Supreme Court was denied November 29, 2006, S146586.