Filed 5/7/14  P. v. AlvarezAlvarez CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL ALVAREZALVAREZ,<br><br>    Defendant and Appellant. | G047701<br><br>(Super. Ct. No. 10HF0476)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Miguel AlvarezAlvarez was convicted of two counts of forcible rape, as well as additional charges in an earlier trial that stemmed from the same incident, an assault on his former girlfriend. Defendant argues two errors with respect to the admissibility of evidence. First, he asserts the court should not have admitted expert opinion testimony from a nurse who examined the victim after the assault, arguing this was improper expert opinion. Second, he argues the court erred by not allowing him to present evidence the victim applied for a U visa based on the assault, claiming its probative value outweighed the potential for prejudice. We conclude that both decisions regarding the admissibility of evidence were within the court's permissible discretion, and therefore affirm.

I

FACTS

In an amended information, the Orange County District Attorney charged that on March 17, 2010, defendant committed two acts of forcible rape (Pen. Code, § 261, subd. (a)(2)[1] (counts one and two)), willful infliction of corporal injury on a coparent (§ 273.5, subd. (a), count three), and criminal threats (§ 422, count four), all against Teresa A. The information also alleged additional allegations and a number of enhancements, including the use of a cord and a knife as weapons in connection with counts one and two, the personal use of a deadly weapon on those counts, and the personal use of a deadly weapon (the cord) on count three. (§§ 667.61, subds. (b), (e)(4), 1192.7, 12022, 12022, subd. (b)(1), 12022.3, 12202.3, subd. (a).)

At the first trial in this matter, at which the victim, Teresa, could fairly be termed a reluctant witness, Teresa testified that she and defendant had dated for almost six years. They had lived together with their young daughter until early in March 2010, when Teresa ended the relationship and defendant moved out of the apartment.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

2

On March 17, 2010, when Teresa woke up in the morning, with her daughter sleeping next to her, defendant was in her apartment. Defendant put a cable around her neck while Teresa was on her back, and defendant was on his hands and knees over her. The cable was tight around Teresa's neck. Defendant accused her of cheating on him and rejecting him, and demanded a photo of her taken the previous weekend. He told her that he loved her and wanted another chance. Around this time, he had taken the cable off Teresa's neck. Teresa testified that after some discussion, she hugged him and then they had intercourse, stopping when the child woke up.

Teresa tended to the child and then defendant and Teresa resumed having intercourse. Defendant left shortly thereafter. Teresa had already decided that she did not want to reunite with him.

Teresa's friend Alma came over, and after Teresa told her what had happened, Alma called 911. Teresa told the 911 operator that defendant had come over with a knife, choked her with a cable, and threatened that he would come back to kill her. She was crying during the phone call.

Officer Jose Torres of the Costa Mesa Police Department responded to the call. Teresa testified she did not remember most of what she told Torres, and denied some of her statements to him entirely. Torres testified about Teresa's statements and demeanor at some length. In addition to the notes he took, he was also wearing a digital audio recorder at the time, and he reviewed the recording and transcript prior to trial. When he arrived, Teresa was crying and looked scared. Teresa told Torres that defendant had wrapped a cord around her neck, tightened it, and threatened her with a knife, and she was afraid defendant was going to kill her and the baby. Teresa also said that defendant had hit her before, approximately six times, and that he had threatened to take the baby away to Mexico. With respect to the intercourse, Teresa told Torres that defendant had forced himself on her, with the cord around her neck. After she got the baby some milk to quiet her, defendant forced her to have intercourse again, this time at

3

knifepoint. Teresa told Torres that defendant had said that if she did not want to have problems, she would cooperate.[2]

On the afternoon of the incident, Toyetta Beukes, a member of the Sexual Assault Response Team (SART) performed an exam on Teresa. Teresa consented to the exam. Teresa told Beukes that she had been sexually assaulted twice, once with a cord around her neck and the other time at knifepoint. Teresa was cooperative, but tearful at times. With respect to the cord, Teresa said defendant had choked her on and off, loosening and tightening the cord, for about five minutes. Teresa's eyes were red, and Beukes testified the redness was the result of either the strangulation and/or the crying. Teresa did not have any genital injuries. Beukes testified that in approximately 80 to 90 percent of the exams she had performed in cases involving domestic violence, the victim's genital exam was normal.

At trial, a doctor testified for the defense that he had reviewed the SART and investigator report, and did not see any sign of forced penetration or completed strangulation. He testified the redness in her eyes was not "related necessarily to strangulation."

Defendant was interviewed by the police on the day of the incident, and the tape of the interview was played at trial. Defendant said he went to Teresa's house that day to talk to her. He was angry because she wanted her freedom and he wanted another chance to be with her. He went into the bedroom and she woke up. He admitted threatening to take the child away to Mexico. He said he had a cable he brought into the house and he "did lose control and . . . wanted to choke her." Defendant said they had sex and she said she still loved him. The baby was next to them, asleep on the bed. He admitted picking up a knife that was already there, but did not threaten her with it. He

---

[2] Apparently, Teresa's story began to change after visiting defendant in jail in October 2010. She told the district attorney and an investigator that she was giving them new information because she felt bad that he was in jail.

later said he used the knife to scare Teresa. He said they then had sex again. When asked why Teresa would have sex with him when she had said she does not love him anymore, defendant said he thought he had forced her.

After the close of the first trial, the jury found defendant guilty of counts three and four and the related enhancement. The jury did not reach a verdict on counts one and two.

At the second trial, the testimony was largely consistent with the first trial, with the exception of Teresa's. In brief, she testified in a manner far more consistent with the testimony of others in the first trial and with what she had told the police on the date of the incident. In sum, defendant was angry when he came to her apartment, threatened her, and she was scared and felt that not resisting him was the only way to calm him down. He had sex with her twice, with the cable around her neck the first time and using the knife to threaten her the second time. When she went to the kitchen to get milk for her daughter, she sent a text to her friend Alma, asking her to call the police.

Teresa also testified that after she visited defendant in jail, she went to the district attorney's office and changed her statement so that he would be released. She also testified at a court hearing that the sex was consensual in order to get him released.

Following retrial, the jury found defendant guilty of counts one and two, and returned true findings on the relevant enhancements. Defendant was sentenced to 30 years to life. He now appeals.

II

DISCUSSION

*Standard of Review*

A trial court's ruling on the admissibility of evidence is generally reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196-197 ["[i]n determining the admissibility of evidence, the trial court has broad discretion. . . . On appeal, a trial court's decision to admit or not admit evidence, whether made *in limine* or

5

following a hearing pursuant to Evidence Code section 402, is reviewed only for abuse of discretion."].) Such rulings "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

*Beukes's Testimony*

Defendant argues the trial court improperly permitted Beukes's testimony on the issues of why Teresa's eyes were red on the exam and the frequency of normal genital exams on domestic violence rape victims. He argues that "she was a nurse, with no special expertise in strangulation or identifying domestic violence victims."

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720.) Expert opinion testimony is admissible when the subject matter is "beyond common experience," and the expert's opinion would assist the jury. (Evid. Code, § 801, subd. (a).) The question of whether a witness is sufficiently qualified as an expert is within the court's discretion, and the court's exercise of that discretion will not be disturbed absent manifest abuse. (*People v. Jones* (2013) 57 Cal.4th 899, 949.)

Here, Beukes testified she has been a registered nurse since 1994, working in a variety of settings. She had both bachelor and master's degrees as a women's health nurse practitioner. At the time of trial, she was the director of the SART team at the San Gabriel Valley Medical Center, and had been for over two years. She had trained more than 40 physicians, nurse practitioners, and registered nurses in performing sexual assault exams, and had performed more than 3,000 exams herself. About 10 to 20 percent of the cases in which she conducted exams involved alleged domestic violence, and at least 50

6

had involved strangulation. In addition, she performed peer review on the charts of other practitioners, which helped to ensure consistency in findings and documentation.

Defendant attempts to analogize this case to *People v. Fierro* (1991) 1 Cal.4th 173, 223-224 (*Fierro*) disapproved on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 205-206.) In *Fierro*, the defense attempted to qualify a private investigator as "a crime scene reconstruction and ballistics expert." (*Fierro*, *supra*, 1 Cal.4th at p. 223.) He proposed to testify that based on his observations, he believed the victim was standing in a certain position when shots were fired. The investigator "acknowledged that he had no training in pathology and had never attended an autopsy. [The investigator's] experience in accident reconstruction was based on his military service 20 years earlier, when he took photographs of plane and car crashes. He had never photographed a crime scene involving a gunshot death. His opinion regarding the effect of the bullets on the victim's body was based on his viewing of documentary films of men in combat. His purported ballistics expertise was based on his own reading and experience with guns; he had no formal training in ballistics . . . ." (*Id.* at p. 224.) Thus, the court concluded, the trial court had not erred in concluding that the investigator "had not demonstrated an expertise in either crime reconstruction or ballistics, and limited his testimony to his observations of the crime scene." (*Ibid.*)

Similarly, in *People v. Hogan* (1982) 31 Cal.3d 815 (disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771), the court found that a criminalist who had no qualifications to testify about blood spatter could not testify on that topic. (*People v. Hogan*, *supra*, 31 Cal.3d at p. 852.) "He had admittedly received no formal education or training to make such determinations. His background on the subject consisted of viewing some years prior an exhibit, which had since been discarded, prepared by some unknown criminalist which demonstrated patterns of human blood dropped from various heights and angles. [The criminalist] had also read some years prior a book about flight patterns of blood. Also, he had observed bloodstains at many

7

crime scenes, and had determined in his own mind whether they were spatters or 'wipes,' but had never verified his conclusions in any way." (*Ibid.*, fn. omitted.)

Unfortunately for defendant, these cases have little applicability here. Beukes, unlike the "experts" in either *Fierro* or *Hogan*, had significant relevant experience and training in evaluating the injuries suffered by sexual assault victims. Her education was directly applicable to the relevant issues, and she had extensive practical experience. She had conducted hundreds of exams involving alleged domestic violence, and at least 50 involving strangulation. Based on this information, the trial court did not err by admitting Beukes's testimony as an expert. She was more than qualified to opine about why Teresa's eyes might have been red, and whether a normal genital exam had any particular significance. Any question about Beukes's specific knowledge as to these two opinions was relevant to the weight of the evidence, not its admissibility. (*People v. Jones, supra,* 57 Cal.4th at pp., 949-950.)

While a harmless error analysis is unnecessary here, it is worth noting that this evidence was particularly benign in the context of the case. Given the totality of the facts here, the issue of whether she had a normal genital exam was not particularly important. With respect to the reason Teresa's eyes were red, again, this was simply not a key issue in this case, and even if Beukes had not opined on either subject, it was not reasonably probable that defendant would have obtained a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818.)

*U Visa*

At the beginning of trial, the prosecution objected to proposed defense evidence that Teresa had applied for U visa. Under federal immigration regulations (8 C.F.R. § 214.14 (2012)), an undocumented immigrant who is the victim of certain crimes can apply for a "U visa" providing temporary relief from deportation, and acquire temporary nonimmigrant legal status if local law enforcement authorities certify that the

8

alien would be of assistance in an investigation or prosecution.[3]  The prosecution argued there was no evidence Teresa knew anything about the U visa prior to calling 911, and therefore, presumably, it provided no motive for calling the police on the day of the incident.  The defense argued that Teresa's recital of the facts had been inconsistent throughout the life of the case, and therefore an additional motive to lie went to the heart of the defense.

When questioned, Teresa stated she originally found out about the visa on the day of the incident in the waiting room for the sexual assault exam.  Later, she spoke with a volunteer at the Public Law Center.  She wanted to know if she qualified for a U visa as a victim of domestic violence.  She understood that if she qualified, she could remain in the country legally for a period of time.  She apparently signed an application but decided not to go forward.

After Teresa's testimony, defense counsel argued that she must have withdrawn the application because she made a false statement in it.  The prosecution argued such a claim was without foundation.  The trial court felt that Evidence Code section 352 was applicable.  If the jury heard such evidence, they would believe that Teresa was undocumented, and might well believe the same about defendant.  The court believed the visa had little significance, but was potentially highly prejudicial, and therefore declined to admit testimony about it.

While defendant attempts to raise this issue to a constitutional level, arguing the exclusion of the visa evidence was unconstitutional, we disagree.  (*People v. Boyette* (2002) 29 Cal.4th 381, 428 ["'excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.'"].)  Evidence Code section 352 gives the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a)

---

[3] See http://www.usimmigrationsupport.org/visa-u.html [as of April 30, 2014].

9

necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Although "'[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) That is all that happened here. The visa was a tangential, collateral issue, and allowing evidence about it invited speculation about the legal status of both Teresa and, potentially, defendant, which was completely irrelevant to this case. The trial court was well within its discretion in excluding reference to the visa.

Further, even if this was error, it was entirely harmless. Defendant focuses on the importance of impeaching Teresa's credibility, but there was already ample evidence of Teresa's changing stories throughout the life of this case that provided more than enough to impeach her credibility. To the extent defendant argues it provided a motive for Teresa to lie that she was ever raped, the uncontroverted evidence was that she did not learn about the visa until after the incident, when she was waiting for a sexual assault exam. Then, even though she had learned about the existence of the visa, she changed her story in an attempt to eliminate defendant's culpability, and testified only as a very reluctant witness at the first trial. Thus, any claim that she had fabricated the sexual assault in order to apply for the visa was contradicted by the facts on the ground, particularly given that she did not follow through and file the application. Such a version of the facts simply makes no sense, given the timing of various events.

Given the overwhelming evidence, including the police testimony, the physical exam, and defendant's statements to the police, there is no reasonable argument

10

that learning Teresa had applied and withdrawn an application for a U visa would have changed the mind of any reasonable juror.[4]   Thus, there was no error.

### III

### DISPOSITION

The judgment is affirmed.


                                                          MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

---

[4] We find no prejudice under either relevant standard.  (Cf. *People v. Watson, supra,* 46 Cal.2d 818, and *Chapman v. California* (1967) 386 U.S. 18.)

11